AO 91 (Rev. 11/11) Criminal Complaint                          AUSA Nicole M. Kim (312) 886-7635

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

1 - PABLO VEGA CUEVAS,
2 - ARTURO MARTINEZ,
3 - ALEXANDER FIGUEROA,
4 - ELISEO BETANCOURT-PEREIRA,
5 - WILFREDO FLORES-SANTOS,
6 - ROBERTO SANCHEZ,
7 - JOSE RODRIGUEZ, and
8 - ISAIAS MANDUJANO

CASE NUMBER:

MAGISTRATE JUDGE SCHENKIER

14 CR 705

**UNDER SEAL**

**FILED**

DEC - 8 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

### Count One

*Code Section*

21 U.S.C. §§ 846 and 841(a)(1)

*Offense Description*

Beginning no later than August 2013 and continuing to in or about November 2014, in the Northern District of Illinois and elsewhere, defendants PABLO VEGA CUEVAS, ARTURO MARTINEZ, ALEXANDER FIGUEROA, ELISEO BETANCOURT-PEREIRA, WILFREDO FLORES-SANTOS, ROBERTO SANCHEZ, and JOSE RODRIGUEZ did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance

## Count Two

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | On or about April 29, 2014, in the Northern District of Illinois, ISAIAS MANDUJANO, did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

ADAM J. STACHECKI
Special Agent, Drug Enforcement Administration

Sworn to before me and signed in my presence.

Date: December 8, 2014

*Judge's signature*

City and State: Chicago, Illinois

Sidney I. Schenkier, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT     )

                                          )     ss

NORTHERN DISTRICT OF ILLINOIS    )

I, Adam J. Stachecki, being duly sworn, state as follows:

## INTRODUCTION

1.     I am a Special Agent with the Drug Enforcement Administration and have been so employed since approximately May 2012.

2.     Since becoming a DEA Special Agent, my duties have included the investigation of criminal violations of federal narcotics laws, including, but not limited to, 21 U.S.C. §§ 841(a), 843(b), and 846, along with violations of 18 U.S.C. §§ 1956 and 1957 (money laundering). I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7), that is an officer of the United States who is empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. In addition, I have been involved in various types of electronic surveillance (including the interception of wire and electronic communications) and the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances. Through my training, education, and experience, I have become familiar with the manner in which illegal narcotics are transported, stored, and distributed and the methods of payments for those narcotics.

3.     Because this Affidavit is for the limited purpose of establishing probable cause to support the criminal complaint and the issuance of arrest warrants against the proposed defendants, as well as the proposed search and

seizure warrants, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the entities, individuals, and events described in this Affidavit.

4.     This Affidavit is made in support of a multi-count complaint that charges as follows:

a.     Count One: Beginning no later than August 2013 and continuing to in or about November 2014, in the Northern District of Illinois and elsewhere, defendants PABLO VEGA CUEVAS, ARTURO MARTINEZ, ALEXANDER FIGUEROA, ELISEO BETANCOURT-PEREIRA, WILFREDO FLORES-SANTOS, ROBERTO SANCHEZ, and JOSE RODRIGUEZ did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846.

b.     Count Two: On or about April 29, 2014, in the Northern District of Illinois, ISAIAS MANDUJANO did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

5.     The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other

federal and local law enforcement officers ("LEOs"); (c) review of consensually recorded conversations and conversations intercepted pursuant to orders authorizing the interception of wire and electronic communications; (d) laboratory analysis reports; (e) physical surveillance and surveillance reports; (f) criminal history records; (g) information from a cooperating source; (h) telephone records; and (i) my training and experience and the training and experience of other law enforcement agents.

## FACTS SUPPORTING PROBABLE CAUSE

### I.   BACKGROUND OF THE NARCOTICS TRAFFICKING INVESTIGATION AND SUMMARY OF PROBABLE CAUSE

6.     The complaint is based on an investigation by the DEA of individuals involved in the trafficking of narcotics from Mexico to the Chicago, Illinois area. During the investigation, LEOs developed evidence that the defendants were involved in a drug trafficking organization ("DTO") operating in Mexico and the Chicago area. The investigation included the court-authorized interceptions of communications over various cellular telephones and Blackberry devices used by the following individuals:[1]

| Target Phone | Phone / PIN Number | User | Intercept Period |
|---|---|---|---|
| Target Phone 1 | (630) 770-8920 | Pablo VEGA Cuevas | 10/18/13 to 11/15/13 |
| Target Phone 1 | (630) 770-8920 PIN 333FF6A7 | Pablo VEGA Cuevas | 11/15/13 to 12/14/13 |

[1] The interception orders for Target Phone 1 were authorized by Judge Paul Biebel, Jr. of the Circuit Court of Cook County, Illinois. The remaining interception orders were signed by Chief Judge Ruben Castillo and Acting Chief Judges of the Northern District of Illinois who authorized 30-day interception periods for each of the Target Devices.

| Target Phone | Phone / PIN Number | User | Intercept Period |
|---|---|---|---|
| Target Device 1 | PIN 2A72474D | Arturo MARTINEZ | 3/20/14 to 4/18/14 <br> 4/28/14 to 5/1/14 |
| Target Device 2 | PIN 2823BC76 | Pablo VEGA Cuevas | 4/25/14 to 5/2/14 |
| Target Device 3 | PIN 2A922D8E | Roberto SANCHEZ | 4/25/14 to 5/4/14 |
| Target Device 4 | PIN 333F1B34 | Pablo VEGA Cuevas | 5/28/14 to 6/26/14 <br> 7/3/14 to 7/15/14 |
| Target Device 5 | PIN 2824C71E | FNU LNU a/k/a "STAR" | 7/7/14 to 7/10/14 |
| Target Device 6 | PIN 2A10655C | FNU LNU a/k/a "LOBO al MILLON" | 7/3/14 to 7/7/14 |
| Target Device 7 | (331) 755-7275 <br> PIN 333E56DF | Alexander FIGUEROA | 7/1/14 to 7/22/14 <br> 7/3/14 to 7/22/14 |
| Target Device 8 | PIN 2B7586E0 | Pablo VEGA Cuevas | 8/5/14 to 9/2/14 |
| Target Device 9 | PIN 3329D00E | Pablo VEGA Cuevas | 9/24/14 to 10/24/14 <br> 10/25/14 to 11/3/14 |
| Target Device 10 | PIN 2A0AA879 | FNU LNU a/k/a "SILVER" | 9/24/14 to 10/9/14 |

## A.    The Defendants' Drug Trafficking Operation and Their Roles

7.    Members of the VEGA DTO include PABLO VEGA CUEVAS, ARTURO MARTINEZ, ALEXANDER FIGUEROA, ELISEO BETANCOURT-PEREIRA, WILFREDO FLORES-SANTOS, ROBERTO SANCHEZ, and other individuals.  Members of the VEGA DTO transported drugs from Mexico to the Chicago area, stored drugs at warehouses in Aurora, Illinois and Batavia, Illinois, and distributed drugs to narcotics customers.  As discussed in this Affidavit, the VEGA DTO distributed narcotics to wholesale narcotics customers ROBERTO SANCHEZ, ISAIAS MANDUJANO, and others in the Northern District of Illinois. The VEGA DTO also distributed narcotics to, and picked up narcotics proceeds from, JOSE RODRIGUEZ, a narcotics courier.

4

8.     PABLO VEGA CUEVAS was a narcotics importer and distributor based in the Aurora, Illinois area. VEGA was the leader of the Chicago cell of the Guerrero Unidos DTO in Mexico ("GUDTO"). VEGA worked with various narcotics sources in Mexico to import wholesale amounts of heroin and cocaine from Mexico to Illinois and coordinated the distribution of heroin and cocaine and the collection of narcotics proceeds in the Chicago area on behalf of the GUDTO. VEGA also worked with individuals in Mexico and the Chicago area to transport and distribute narcotics that were concealed in commercial passenger buses that traveled between Mexico and Chicago. VEGA's wholesale narcotics customers included ROBERTO SANCHEZ and others. VEGA also directed the narcotics trafficking activities of ALEXANDER FIGUEROA, ELISEO BETANCOURT-PEREIRA, WILFREDO FLORES-SANTOS, and others. Additional information concerning VEGA's acts on behalf of the DTO is in paragraphs 20-262 *infra*.

9.     ARTURO MARTINEZ was a Mexico-based narcotics trafficker who worked with VEGA to coordinate the deliveries and pick-ups of narcotics and narcotics proceeds in the Chicago area.   MARTINEZ arranged for various customers, including ROBERTO SANCHEZ, to receive wholesale amounts of heroin and cocaine from the VEGA DTO. MARTINEZ also arranged for the collection and delivery of drug proceeds, including by sending SANCHEZ to deliver proceeds to Individual A, who built hidden compartments in vehicles used by the VEGO DTO to transport narcotics and narcotics proceeds.   Additional information concerning

MARTINEZ's acts on behalf of the VEGA DTO is in paragraphs 23-73, 105, 120, 259-262 *infra*.

10. ALEXANDER FIGUEROA was a narcotics courier for the VEGA DTO. FIGUEROA was responsible for delivering kilogram quantities of narcotics to various wholesale customers of the VEGA DTO, including ROBERTO SANCHEZ, and to narcotics couriers for these customers, including JOSE RODRIGUEZ and others. FIGUEROA also delivered and picked up narcotics proceeds from customers of the VEGA DTO, including SANCHEZ and others. FIGUEROA, along with ELISEO BETANCOURT-PEREIRA and WILFREDO FLORES-SANTOS, also worked to unload narcotics concealed in commercial passenger buses that traveled from Mexico to warehouses in Aurora, Illinois and Batavia, Illinois. Additional information concerning FIGUEROA's acts on behalf of the VEGA DTO is in paragraphs 31-34, 72-91, 130-165, 170-258 *infra*.

11. ELISEO BETANCOURT-PEREIRA ("BETANCOURT") was a narcotics courier for the VEGA DTO. BETANCOURT worked with ALEXANDER FIGUEROA and WILFREDO FLORES-SANTOS to deliver and pick up narcotics and narcotics proceeds from various customers of the VEGA DTO. Additional information concerning BETANCOURT's acts on behalf of the VEGA DTO is in paragraphs 145-225 *infra*.

12. WILFREDO FLORES-SANTOS was a narcotics courier for the VEGA DTO. FLORES-SANTOS worked with ALEXANDER FIGUEROA and ELISEO BETANCOURT-PEREIRA to deliver and pick up narcotics and narcotics proceeds

from various customers of the VEGA DTO. Additional information concerning FLORES-SANTOS' acts on behalf of the VEGA DTO is in paragraphs 134-225 *infra*.

13. ROBERTO SANCHEZ purchased wholesale amounts of heroin and cocaine from the VEGA DTO. SANCHEZ received the narcotics from various narcotics runners working on behalf of the VEGA DTO, and in turn, distributed the narcotics to his own customers, including ISAIAS MANDUJANO. SANCHEZ also acted as a courier for the VEGA DTO by delivering narcotics proceeds to various individuals at the direction of MARTINEZ. Additional information concerning SANCHEZ is in paragraphs 25-71, 82-127 *infra*.

14. ISAIAS MANDUJANO purchased wholesale amounts of heroin from ROBERTO SANCHEZ. On April 29, 2014, MANDUJANO received one kilogram of heroin from SANCHEZ. Additional information concerning MANDUJANO is in paragraphs 98-126 *infra*.

15. JOSE RODRIGUEZ is a narcotics courier for a narcotics customer of the VEGA DTO. RODRIGUEZ delivered narcotics proceeds to, and obtained narcotics from, the VEGA DTO. Additional information concerning RODRIGUEZ is in paragraphs 162-173, 202-203 *infra*.

B. **Law Enforcement's Seizures of Narcotics and Narcotics Proceeds**

16. The Probable Cause section of this Affidavit sets forth chronological detail of certain of the narcotics-related activities by the defendants, and includes detailed information regarding the following seizures of narcotics and narcotics proceeds:

7

a.      On August 21, 2013, LEOs seized approximately 12 kilograms of heroin and 9 kilograms of cocaine from Individual B, after Individual B received the narcotics from a confidential source ("CS-1") who, prior to CS-1's cooperation, worked as a narcotics courier for the VEGA DTO (see paragraphs 17-19).

b.      On August 21, 2013, LEOs seized approximately $460,861 in narcotics proceeds from the VEGA DTO (see paragraph 17).

c.      On October 16, 2013, LEOs seized approximately $8,238 in narcotics proceeds from the VEGA DTO (see paragraph 44, footnote 23).

d.      On June 7, 2014, LEOs seized approximately 25 kilograms of heroin and 60 grams of cocaine from JOSE RODRIGUEZ, after ALEXANDER FIGUEROA and ELISEO BETANCOURT-PEREIRA distributed the heroin to RODRIGUEZ (see paragraphs 201-203).

e.      On June 10, 2014, LEOs seized approximately 31 kilograms of heroin from Individual C, after ALEXANDER FIGUEROA and ELISEO BETANCOURT-PEREIRA distributed the heroin to Individual C (see paragraph 225).

## II.   INFORMATION RECEIVED FROM THE CONFIDENTIAL SOURCE

17.     On August 21, 2013, LEOs conducted a traffic stop of Individual B's vehicle, in which LEOs discovered approximately $200,000 in United States currency. Pursuant to a consent search of Individual B's residence in Chicago, Illinois, LEOs discovered an additional approximately $231,000 in United States currency, 12 kilograms of heroin, and 9 kilograms of cocaine. According to Individual B, Individual B delivered and picked up these narcotics and narcotics

8

proceeds on CS-1's behalf. At Individual B's residence, LEOs encountered CS-1 and arrested CS-1 for narcotics-trafficking offenses.[2] CS-1 agreed to cooperate with LEOs and consented to a search of CS-1's residence where LEOs found an additional $30,000 in United States currency, which CS-1 identified as drug proceeds that CS-1 had previously collected from a narcotics customer.[3]

18. According to CS-1, since February 2013, CS-1 has picked up and delivered multi-kilogram quantities of narcotics as well as narcotics proceeds on behalf of ARTURO MARTINEZ and an individual known to CS-1 as FNU LNU, a/k/a "TRANSFORMER."[4] According to CS-1, at MARTINEZ's direction, CS-1 picked up the narcotics and narcotics proceeds that LEOs found in Individual B's vehicle and residence on August 21, 2013. CS-1 then directed Individual B to deliver and pick up these narcotics and narcotics proceeds on behalf of the VEGA DTO. CS-1 also identified ROBERTO SANCHEZ as a narcotics customer of

---

[2] No charges have been filed against CS-1 in connection with this arrest.

[3] CS-1 is cooperating in exchange for consideration on what, if any, charges CS-1 faces in connection with CS-1's arrest on August 21, 2013. To date, CS-1 has been paid approximately $8,647 by the DEA for operational expenses. CS-1 has at least one prior arrest for larceny and no known criminal convictions. The information provided by CS-1 to LEOs was proven reliable in that it was corroborated by consensually recorded telephone communications, court-authorized wire and electronic communications, surveillance, and law enforcement records.

[4] CS-1 subsequently identified an unmarked Illinois driver's license and surveillance photographs of PABLO VEGA CUEVAS as the individual CS-1 knows as "TRANSFORMER." CS-1 also informed LEOs that "TRANSFORMER" is the Blackberry messenger screen name for VEGA.

MARTINEZ and VEGA.[5]  According to CS-1, CS-1 previously picked up from, and delivered narcotics proceeds to, SANCHEZ on behalf of the VEGA DTO.

19.     According to CS-1, when narcotics or narcotics proceeds needed to be picked up or delivered, CS-1 would receive a call from MARTINEZ and/or VEGA who gave CS-1 further instructions on how and where to pick up and deliver the narcotics and narcotics proceeds. According to CS-1, MARTINEZ resides in Mexico, from where he coordinates the delivery of narcotics to the Chicago, Illinois, area. On or about August 21, 2013, CS-1 consented to a search of CS-1's Blackberry device.  Pursuant to this consent search, LEOs observed the following PIN-to-PIN conversations between CS-1 and VEGA, as described below in paragraphs 20-21.[6]

20.     On August 16, 2013, between approximately 7:12 p.m. and 10:39 p.m., CS-1, using a Blackberry device, had the following BBM conversation with VEGA,[7]

---

[5] CS-1 subsequently identified an unmarked Illinois driver's license photograph of ROBERTO SANCHEZ as the individual CS-1 knows as ROBERTO SANCHEZ.  According to Illinois Secretary of State records, ROBERTO SANCHEZ is the president and registered agent of R. Sanchez Landscaping, Inc.

[6] After CS-1's arrest on August 21, 2013, LEOs seized CS-1's Blackberry device.

PIN-to-PIN communications are asynchronous messages (messages that do not require both parties to be connected and "present" at the same time) similar to a text message, but transmitted via Blackberry's proprietary communication network. Thus, the holder of a Blackberry ("BB") device cannot have a PIN-to-PIN communication with someone who does not have a BB device. A PIN-to-PIN communication is addressed directly to a BB PIN. As the PIN is unique to each device, Blackberry regulates the steady state of connection of the PIN to ensure that PIN-to-PIN traffic reaches only its intended destination.

Furthermore, BB users may also communicate via the Blackberry Messenger ("BBM") system, which is Blackberry's proprietary instant messaging service. Like PIN-to-PIN communications, BBM uses device PINs for addressing, again ensuring that BBM traffic only reaches its intended destination.

[7] Reference is made in this Affidavit to consensually recorded and unrecorded telephone conversations, BBM conversations observed in CS-1's telephone by LEOs, and court-authorized interception of BBM conversations over Target Devices used by the defendants

who was using Blackberry PIN 333FF6A7 ("Vega Device 1").[8]  In that conversation,

VEGA stated, "Dude, take care of the guy [deliver narcotics to] chika.  Have him tell

you what he needs."  CS-1 replied, "Okay, no problem."  VEGA further stated. "All

right, thank you.  Let me know what [narcotics] you give him."  CS-1 responded,

"Okay, they want three big ones [three kilograms of narcotics] and two small ones

---

(collectively, the "Communications").  In certain instances, these Communications are summarized and placed in context in brackets.  The bracketed comments are my understanding of the Communications and coded language used during the Communications.  My understanding is based on my training and experience and investigation to date, my discussions with other LEOs, the experience of other LEOs in this investigation, and other evidence developed during the course of the investigation, including information obtained from CS-1 and CS-1's explanation of the language used in the Communications. The times listed for the Communications are approximate.  Unless otherwise noted, the Communications are in Spanish and were translated by Spanish speaking agents or interpreters contracted by DEA.  Further, summaries of the Communications described herein do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.  In addition, all of the voice identifications in the consensually recorded telephone conversations are preliminary. In most cases, voice identifications are based on names used during the recorded conversations, information obtained by the investigative agents and CS-1, and voice recognition that has been accomplished to date by LEOs.  Italicized words appearing in such summaries were spoken in English, or have been left in Spanish for emphasis.

Unless otherwise noted, LEOs used one or more of the following methods to verify that each of the consensually recorded and unrecorded calls, text messages, and Blackberry PIN-to-PIN messages summarized in the Affidavit in which CS-1 participated in was to or from the telephone number or Blackberry PIN specified in the Affidavit:  analysis of toll records; LEOs viewing incoming or outgoing texts and PIN-to-PIN messages on the screen of CS-1's cell phone; and LEOs' review of call detail in CS-1's cell phone.

[8] The identification of VEGA as the user of Vega Device 1 is based on the following:  (a) based on telephone location information for Vega Device 1, which was authorized by a judge of the Circuit Court of Cook County, Illinois on August 23, 2013, on August 26, 2013, the user of Vega Device 1 was located at 641 Grand Avenue, Aurora, Illinois; (b) according to Illinois Secretary of State records, a PABLO VEGA CUEVAS is associated with 641 Grand Avenue, Aurora, Illinois; (c) LEOs compared a photograph of the individual seen during surveillance at 641 Grand Avenue on August 26, 2013 to an Illinois driver's license photograph of PABLO VEGA CUEVAS and determined that the same person is depicted in both photographs.

11

[two kilograms of narcotics] early tomorrow." According to CS-1, CS-1 delivered these amounts of narcotics shortly after this conversation with VEGA.

21. On August 20, 2013, between approximately 7:16 p.m. to 7:17 p.m., CS-1, using a Blackberry device, had a BBM conversation with VEGA, who was using Vega Device 1. During that conversation, VEGA stated, "I just gave your telephone number for you to deliver two hundred thousand dollars today. They are going to tell you that they are calling on behalf of Transformer [VEGA]." CS-1 replied, "Okay."

22. Based on the above-described BBM communications, I believe that VEGA gave CS-1's telephone number to an unknown person, who was to call CS-1 to coordinate the pickup of $200,000 in narcotics proceeds on behalf of VEGA. According to CS-1, Individual B attempted to deliver the $200,000, but the money was seized by LEOs on August 21, 2013.

A. **CS-1's Consensually Recorded Calls with MARTINEZ and SANCHEZ in August and September 2013 Regarding Narcotics Trafficking Activities.**

*Call with MARTINEZ Regarding Law Enforcement Seizure*

23. On August 21, 2013, at approximately 8:45 p.m., at the direction of law enforcement, CS-1 had a consensually recorded telephone conversation with MARTINEZ, who was using Mexican telephone number 5217332947475 ("Mexico Phone 1").[9] During that call, MARTINEZ asked, "Explain to me exactly what

---

[9] After CS-1's arrest on August 21, 2013, CS-1 identified two Mexican telephone numbers used by MARTINEZ, one of which was Mexico Phone 1. Based on information provided by CS-1, the context of this call, and the seizure of narcotics and narcotics proceeds at

happened [what happened earlier that day when drugs and drug proceeds were seized by LEOs]." CS-1 replied, "Yesterday, Transformer [VEGA] sent me a message at night." CS-1 added, "That they [VEGA's narcotics associates] were going to call on behalf of Transformer [VEGA] ... to deliver two hundred [pickup of $200,000 in narcotics proceeds from VEGA's narcotics customers]." CS-1 asked, "But I mean, is Transformer [VEGA] or one of you guys going to do something because you are mad?" CS-1 added, "It's a lot of money." MARTINEZ responded, "I already told you ... they [narcotics associates of VEGA and MARTINEZ] are not those types of people that will do something over money .... You need to trust me." MARTINEZ later added, "Remember that I told you that if you do any shit to me and betray me, I will be the one held responsible, not you. They [narcotics associates of VEGA and MARTINEZ] are going to talk to me, not to you." MARTINEZ stated, "I told you that since the beginning, when I was over there [that last time MARTINEZ was in Chicago]."

24. Based on the above-described telephone conversation, I believe that MARTINEZ asked CS-1 about the law enforcement seizure of narcotics and narcotics proceeds on August 21, 2013. CS-1 asked MARTINEZ whether there would be any consequences to CS-1 losing the drugs and money. MARTINEZ replied that he, not CS-1, would be held responsible for the loss.

---

Individual B's residence on August 21, 2013, I believe MARTINEZ was a participant in this call and inquired about the law enforcement seizure.

*Calls with SANCHEZ Regarding the Pick Up of Narcotics Proceeds*

25.     On September 4, 2013, at approximately 6:48 p.m., at the direction of law enforcement, CS-1 had a consensually recorded telephone conversation with SANCHEZ, who was using telephone number (773) 301-4087 (the "Sanchez Phone").[10]   During that call, CS-1 stated, "I got to do something real quick." SANCHEZ replied, "You have to wait for me bro.  You have to wait.  I cannot ... back and forth with this shit [the drug proceeds]."  CS-1 asked, "You cannot come in an hour?"  SANCHEZ responded, "No.  Now, bro ... I have to do this.  And I have to right now."  SANCHEZ added, "I am right here close to ya."  CS-1 replied, "Okay, cool.  I will be here then."

26.     Continuing on September 4, 2013, at approximately 7:00 p.m., SANCHEZ met CS-1 in the 4000 block of N. Monticello, Chicago, Illinois.  This meeting was not observed or recorded by LEOs.  According to CS-1, during that meeting, SANCHEZ gave CS-1 approximately $302,855 in cash.  Also according to CS-1, this money was payment for the kilogram quantities of cocaine that CS-1 previously delivered to SANCHEZ at MARTINEZ's direction prior to CS-1's cooperation with LEOs.  Approximately fifteen minutes after CS-1 received the

---

[10] The identification of SANCHEZ as the user of the Sanchez Phone is based on the following:  (a) based on telephone location information for the Sanchez Phone, which was authorized by Judge Nicholas Ford of the Circuit Court of Cook County, Illinois, on or about August 30, 2013, on September 5 and September 9, 2013, the user of the Sanchez Phone was located at 2241 Monitor Avenue, Chicago, Illinois, which CS-1 identified as SANCHEZ's residence; and (b) LEOs showed CS-1 an unmarked Illinois driver's license photograph of SANCHEZ and CS-1 identified the individual in the photograph as the person CS-1 knows as SANCHEZ and the individual who delivered approximately $302,855 of narcotics proceeds to CS-1 on September 4, 2013.

The September 4, 2013, call was in English.

money from SANCHEZ, LEOs met with CS-1 and took custody of the $302,855, which was contained inside a black, plastic trash bag.

**B.    On September 4, 2013, VEGA and MARTINEZ Directed CS-1 to Deliver $263,000 in Narcotics Proceeds to FIGUEROA.**

27.    On September 4, 2013, at approximately 9:53 p.m., at the direction of law enforcement, CS-1 made consensually recorded telephone call to VEGA, who was using Vega Device 1. During that call, VEGA stated, "They are telling me over at …. That I'm going to send my guy [VEGA's narcotics courier] early." VEGA added, "This one, that guy [VEGA's narcotics courier] that's going is trustworthy. He is my brother in law." Later in the conversation, VEGA stated, "Perfect. I'm going to give this number, then, I'm going to give this number [CS-1's telephone number] to my guy, to my brother in law. He is my sister's [Individual H's] husband." VEGA further stated, "Don't feel like you can't trust him [VEGA's brother in law]. If anything happens there I will be held responsible, because that's my guy [VEGA's brother in law]." VEGA also stated, "In other words, he is my brother in law and is family."

28.    Continuing on September 4, 2013, at approximately 10:21 p.m., at the direction of law enforcement, CS-1 made a consensually recorded telephone call to MARTINEZ, who was using Mexican telephone number 5217331337174 ("Mexican Phone 2").[11] During that call, MARTINEZ asked, "What happened?" CS-1 replied,

---

[11] The identification of MARTINEZ as the user of Mexico Phone 2 is based on the following: LEOs listened to the voice of the user of Mexico Phone 2 and compared it to the voice of the individual consensually recorded using Mexico Phone 1 and determined that it was the same person.

"Okay, it's [the money SANCHEZ previously delivered to CS-1] ... three hundred two, eighty-fifty [$302,850]."[12] MARTINEZ further asked, "Okay, how much was he [SANCHEZ] short?" CS-1 responded, "He [SANCHEZ] was short five thousand [$5,000]." MARTINEZ stated, "He [SANCHEZ] told me that you [CS-1] were calling him and said he [SANCHEZ] was short four [$4,000] ... He [SANCHEZ] said that he [SANCHEZ] was going to drop them [narcotics proceeds] off early in the morning." CS-1 asked, "Okay, listen, what do I do with the earnings [MARTINEZ's profits from the narcotics proceeds]?" MARTINEZ replied, "Okay, from there our earnings [MARTINEZ and CS-1's cut] are twenty [$20,000]." MARTINEZ then added, "I'll call you back, dude. Let me do the math and that way I can tell you how much, how much ...."

29. Continuing on September 4, 2013, at approximately 10:48 p.m., CS-1 had a consensually recorded conversation with MARTINEZ, who was using Mexican Phone 3. During that call, MARTINEZ stated, "8 small ones times 31 equals 248 [8 kilograms of cocaine at $31,000 per kilogram, equals a total of $248,000]." MARTINEZ further stated, "Give from eight [8 kilograms of cocaine] which is equal to 248 [$248,000], plus an additional 22,000 [$22,000] that gives you 270 [$270,000]. Then from there we get our profit [MARTINEZ stating that their profit will be taken from the $270,000]."

---

[12] CS-1 inadvertently quoted the amount of proceeds that SANCHEZ previously delivered to CS-1 as $302,850 and not $302,855, which is the amount LEOs recovered from CS-1 earlier that day.

16

30.     Based on the above-described consensually recorded telephone calls, I believe that VEGA instructed CS-1 to pick up narcotics proceeds from his brother-in-law. CS-1 then reported to MARTINEZ that SANCHEZ was short $5,000 when SANCHEZ previously delivered $302,855 in narcotics proceeds to CS-1 on September 4, 2013. MARTINEZ instructed CS-1 to take $270,000 out of the $302,855 delivered by SANCHEZ and deliver the $270,000 of narcotics proceeds to VEGA's brother in law.

31.     On September 5, 2013, at approximately 9:23 a.m., CS-1 had a consensually recorded telephone conversation with ALEXANDER FIGUEROA, who was using telephone number (630) 478-1182 (the "Figueroa Phone").[13] This call was in English. During this call, CS-1 stated, "You know there is ah, K-Mart. On Addison." FIGUEROA responded, "Oh, off the Pulaski." CS-1 stated, "The Addison exit [the Addison street exit of the Kennedy Expressway in Chicago, Illinois]." CS-1 further stated, "Just in that parking lot, bro." CS-1 added, "Real quick. I'll hand it [the narcotics proceeds] off to you real quick, man." FIGUEROA replied, "I am gonna be there in probably in like … 30 minutes."

---

[13] Based on surveillance, information obtained from law enforcement databases, trash pulls, and the September 4, 2013 telephone call between VEGA and CS-1 where VEGA refers to his "brother-in-law," it is believed that FIGUEROA is VEGA's brother-in-law.

The identification of FIGUEROA as the user of the Figueroa Phone is based on the following: Based on telephone location information for the Figueroa Phone, which was authorized by the Circuit Court of Cook County on or about September 11, 2013, LEOs established surveillance at 641 Grand Avenue, Aurora, Illinois. Based on a trash pull at that location, LEOs found material addressed to FIGUEROA at 641 Grand Avenue, Aurora, Illinois. FIGUEROA was identified based on a comparison of the individual seen by LEOs driving during surveillance to an Illinois driver's license photograph of FIGUEROA, and LEOs' determination that they were the same person.

32.     Continuing on September 5, 2013, at approximately 9:33 a.m., CS-1 had a consensually recorded telephone conversation with MARTINEZ, who was using Mexican Phone 2. During this call, MARTINEZ stated, "You're going to take, take seven [$7,000] so there won't be any mistakes." CS-1 asks, "From where?" MARTINEZ replies, "From the account … from their account. From what you're going to deliver [the $263,000 that CS-1 was to deliver to VEGA's brother in law]." MARTINEZ added, "I'm going to let Transformer [VEGA] know that you're going to withdraw seven [$7,000]." MARTINEZ further stated, "And call me once you've handed it [$263,000 in narcotics proceeds] over, so I can give you the names as to how they're going to be placed [where to send the remaining $7,000]."

33.     On September 5, 2013, at approximately 9:50 a.m., LEOs searched CS-1 and CS-1's vehicle for contraband and found none. LEOs then provided CS-1 with a recording device and a duffle bag containing $263,000 in United States currency for the purpose of delivering the money to VEGA's associate. LEOs observed CS-1 drive to a K-mart parking lot located at 3443 W. Addison Avenue, Chicago, Illinois. LEOs further observed FIGUEROA open the rear passenger door of CS-1's vehicle and remove a duffle bag, which contained $263,000.[14] According to the recording of the meeting, FIGUEROA asked, "Is it all there?"[15] CS-1 responded, "Yes." CS-1 further asked, "Is Transformer [VEGA] pissed off?" FIGUEROA replied, "No.

---

[14] LEOs identified FIGUEROA by his Illinois driver's license photograph. In addition, on September 17, 2013, CS-1 identified the individual depicted in an unmarked Illinois driver's license photograph of FIGUEROA as the individual who picked up $263,000 from CS-1 on September 5, 2013.

[15] The conversation between CS-1 and FIGUEROA was in English.

Transformer [VEGA] is cool." FIGUEROA later stated, "Shit [the August 21, 2013 seizure by LEOs of the narcotics and $230,000 drug proceeds] happens and like that's happened before." CS-1 stated, "There is seven grand [$7,000] out of there so it's 263 [$263,000]." FIGUEROA responded, "Okay, I will let him [VEGA] know."

34.     LEOs then observed FIGUEROA place the duffle bag inside a maroon Acura bearing Illinois license N773755.[16] LEOs followed FIGUEROA driving the maroon Acura from the parking lot to a nearby park, where FIGUEROA parked the vehicle and reached into the rear side panel area of the vehicle for approximately ten minutes. LEOs then observed FIGUEROA leave the park and make numerous turns on side streets before driving into the attached garage of 1744 Shari Lane, Aurora, Illinois.[17]

35.     Based on the consensually recorded conversations that CS-1 had with VEGA, MARTINEZ, and FIGUEROA, and the surveillance of CS-1's meeting with FIGUEROA, I believe that MARTINEZ instructed CS-1 to take $7,000 from the $270,000 of narcotics proceeds that CS-1 was supposed to deliver to FIGUEROA. MARTINEZ further instructed CS-1 that he would give CS-1 instructions on where to send the remaining $7,000. MARTINEZ also indicated that he would tell VEGA

---

[16] According to Illinois Secretary of State records, this vehicle is registered to Individual H at 641 Grand Avenue, Aurora, Illinois. According to law enforcement databases, FIGUEROA is associated with 641 Grand Avenue, Aurora, Illinois, and Individual H is FIGUEROA's wife. In addition, pursuant to a trash pull, LEOs found mail addressed to FIGUEROA at that address.

[17] Based on information from law enforcement databases, LEOs' observations of VEGA coming from and going to the residence dozens of times, and location information for Target Devices used by VEGA that showed VEGA at the residence on numerous occasions between August 2013 through November 2014, LEOs determined that VEGA resides at 1744 Shari Lane, Aurora, Illinois.

that CS-1 was going to take out $7,000 from the narcotics proceeds to be delivered to FIGUEROA. CS-1 then delivered $263,000 to FIGUEROA. Based on my training and experience, the experience of other LEOs, and physical surveillance of FIGUEROA, I believe that after FIGUEROA received the money from CS-1, FIGUEROA put the money in a hidden compartment of the maroon Acura.

### C. In September 2013, MARTINEZ Directed CS-1 to Deliver Narcotics Proceeds to Individual A and Individual D.

36. On September 7, 2013, at approximately 9:49 a.m., CS-1 had a consensually recorded telephone conversation with MARTINEZ, who was using Mexican Phone 2. During that call, MARTINEZ stated, "Just take ten tickets [$10,000] to my friend with the garage [Individual A]. What happens is that he [Individual A] is going to look for a truck [vehicle with hidden compartments] for me. For Transformer [VEGA]."

37. Continuing on September 9, 2013, at approximately 10:58 a.m., LEOs searched CS-1 and CS-1's vehicle for contraband and found none. LEOs then provided CS-1 with a bag containing $9,998 in United States currency for the purpose of delivering the money to Individual A. LEOs observed CS-1 drive to the alley next to 2341 North Monitor Avenue, Chicago, Illinois.[18] At that location, Individual A met with CS-1 and took from CS-1 an envelope which contained

---

[18] According to CS-1, in mid-August 2013, at the direction of MARTINEZ, CS-1 went to the area near 2341 North Monitor Avenue, Chicago, Illinois, to meet an individual known to CS-1 as the "Garage," who showed CS-1 how to operate a hidden compartment in a black Jeep. According to CS-1, CS-1 was instructed by MARTINEZ and VEGA to use this Jeep to transport narcotics and narcotics proceeds.

$9,998.[19] CS-1 left the location shortly thereafter. After the transaction, LEOs met CS-1 and searched CS-1 and CS-1's vehicle for contraband and found none.

38. Based on CS-1's consensually recorded telephone call with MARTINEZ and surveillance of CS-1 on September 9, 2013, I believe that MARTINEZ instructed CS-1 to deliver approximately $10,000 of narcotics proceeds belonging to MARTINEZ to Individual A. The money was to pay Individual A to build a hidden compartment in a vehicle that MARTINEZ and VEGA could use to transport drugs and drug proceeds.

39. Continuing on September 11, 2013, at approximately 9:30 a.m., CS-1 had a consensually recorded telephone conversation with MARTINEZ, who was using Mexican Phone 2. In that call, MARTINEZ instructed CS-1 to deliver $10,000 of drug proceeds to "Primo" [Individual D], an individual MARTINEZ identified as his cousin.[20]

40. On September 11, 2013, at approximately 11:11 a.m., CS-1 had a consensually recorded telephone conversation with Individual D, who was using telephone number (708) 953-4817. In that conversation, Individual D asked, "What's up? How are you?" CS-1 replied, "Good, good, good. Hey, we're supposed to deliver something [narcotics proceeds] to you today. Individual D stated, "Oh yeah, well, my cousin [MARTINEZ] called me in the morning, but uh, what time

---

[19] CS-1 identified Individual A as the individual CS-1 knows as "Garage." The identification of Individual A was made through an April 4, 2014, traffic stop of Individual A and LEOs' comparison of the individual seen on surveillance and a law enforcement photograph of Individual A, which LEOs determined to be the same person.

[20] According to CS-1, prior to CS-1's cooperation, CS-1 delivered narcotics proceeds to "Primo [Individual D]" at MARTINEZ's direction.

could I pass by?" CS-1 responded, "If you want, about 2:30?" Later in the conversation, CS-1 stated, "Yeah, right there. By that, *auto parts* that's right there." Individual D replied, "Okay, perfect, yes, I remember."

41.     Continuing on September 11, 2013, at approximately 12:52 p.m., CS-1 had another consensually recorded telephone conversation with Individual D. In that conversation, Individual D asked, "What was I going to ask you? Which street?" CS-1 replied, "Right there on *Lawndale*." Individual D later stated, "Okay, so then I'll call you right now when I'm there. I'm already close by." CS-1 replied, "Okay."

42.     Later that same day, LEOs met CS-1 and searched CS-1 for contraband and found none. LEOs then provided CS-1 with a recording device and $10,000 in cash to provide to Individual D. At approximately 1:00 p.m., LEOs observed a green Honda arrive in an alley near Lawndale and Montrose Avenues in Chicago. LEOs further observed Individual D in the driver's seat of the Honda. CS-1 entered the vehicle and got out shortly afterward. After the meeting, LEOs met with CS-1 at a predetermined location. According to CS-1, CS-1 provided the $10,000 to Individual D in a brown paper bag.[21]

43.     On September 27, 2013, CS-1 had several other consensually recorded telephone conversations with Individual D to deliver narcotics proceeds to Individual D on MARTINEZ's behalf. That same day, at approximately 4:45 p.m., LEOs met CS-1 at a predetermined location. LEOs also searched CS-1 for

---

[21] Although this meeting was recorded, the recording only reflected Individual A and CS-1 engaged in small talk, such as discussing the weather.

contraband and found none. LEOs provided CS-1 with $11,000 in cash for the purpose of delivering the money to Individual D.[22] At approximately 5:12 p.m., LEOs observed Individual D in the driver's seat of the Honda arrive at the corner of Lawndale and Montrose Avenues in Chicago. LEOs further observed CS-1 enter the front passenger seat of the Honda. A few minutes later, CS-1 got out of the vehicle and met LEOs. LEOs searched CS-1 for contraband and found none. According to CS-1, CS-1 delivered the $11,000 to Individual D, who was then supposed to wire the proceeds to MARTINEZ in Mexico.

44. Based on CS-1's consensually recorded conversations with Individual D, information obtained from CS-1, and physical surveillance, I believe that MARTINEZ instructed CS-1 to deliver MARTINEZ's share of drug proceeds to Individual D.[23]

---

[22] CS-1 was also provided with an audio recording device, but the device was inadvertently powered off and did not record CS-1's conversation with Individual D.

[23] Out of the $302,855 of narcotics proceeds that SANCHEZ delivered to CS-1 on September 4, 2013, LEOs used these funds in controlled deliveries by CS-1 and the remaining balance of $8,238 was kept by LEOs for forfeiture on or about October 16, 2013.

III. THE VEGA DTO ACTIVITIES CAPTURED DURING THE WIRETAP INVESTIGATION

    A.    **In March and April 2014, SANCHEZ Received Kilogram Quantities of Heroin from the VEGA DTO and Delivered Narcotics Proceeds to Various Individuals at MARTINEZ's Direction.**

*Between on or about March 18, 2014, through on or about March 21, 2014, SANCHEZ Received Three Kilograms of Heroin from the VEGA DTO.*

45. On March 20, 2014, at approximately 9:23 p.m. (Session #4025137), MARTINEZ, using Target Device 1,[24] had a BBM conversation with VEGA, who was using Blackberry PIN 2B482519 ("Vega Device 2").[25] During that conversation, MARTINEZ asked, "You gave my guy [SANCHEZ] what he [SANCHEZ] wanted, right? And he gave you for one today [SANCHEZ paid for one kilogram of heroin], cousin?" VEGA responded, "He will not be given any [heroin] until tomorrow?" MARTINEZ stated, "No cousin, yesterday you gave him [SANCHEZ] one [one

[24] The identification of MARTINEZ as the user of Target Device 1 is based on the following: (a) information from CS-1 regarding CS-1's dealings with MARTINEZ; (b) the content of recorded calls and BBM exchanges between MARTINEZ and CS-1; and (c) the use of the Blackberry Messenger screen name of "Apaxtla," which is the name CS-1 told LEOs that MARTINEZ previously used.

[25] The identification of VEGA as the user of Vega Device 2 is based on the following: (a) consensual interceptions of BBM communications on CS-1's Blackberry device and pen register data for Target Device 1 showed that VEGA was using Blackberry PIN 334B7A73 in February 2014; and (b) pen register data showed that the last outgoing message from PIN 334B7A73 was on March 14, 2014, and there was no other activity on that PIN since March 14, 2014. On March 15, 2014, DEA Chicago learned that VEGA's brother, Individual MAVC, believed to be one of the leaders of the GUDTO in Mexico, drowned in Mexico. Periodic surveillance at VEGA's residence at 1744 Shari Lane, Aurora, Illinois, revealed that VEGA's vehicle was not at the residence. In addition, interceptions over Target Device 1, used by MARTINEZ, indicated that VEGA was in Mexico. Based on pen register data, surveillance, and a common-call analysis between Blackberry PIN 334B7A73 and Vega Device 2, LEOs identified Vega Device 2 as VEGA's Blackberry PIN. Out of the 35 BBM PINs in contact with Vega Device 2 as of March 14, 2014, 14 of those PINs were also in contact with VEGA's previous BBM PIN 334B7A73.

kilogram of heroin] and he paid for it today, and he will pay for the other [another amount of heroin] tomorrow. The one you gave him four days ago. And, tomorrow, he wants another [additional heroin], okay? Cousin, see if you can give it [heroin] to him [SANCHEZ] as soon as he gives you the paper [money], okay cousin?

46.     Continuing on March 20, 2014, at approximately 9:55 p.m. (Session #4025168), MARTINEZ, using Target Device 1, had a BBM conversation with VEGA, who was using Vega Device 2. During this conversation, VEGA stated, "Yes, it is already going to be arranged with the guy [SANCHEZ]." MARTINEZ responded, "And, hand in one [one kilogram of heroin] more tomorrow. But, are you aware that you gave him [SANCHEZ] one [one kilogram of heroin] and you were paid right away? So you can give the green light [provide SANCHEZ with heroin] so they'll take care of him [SANCHEZ] promptly."

47.     On March 20, 2014, at approximately 10:26 p.m. (Session #4025138), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3.[26] During this conversation, MARTINEZ asked, "How much do you have exactly? You know how you wanted one [one kilogram of heroin] yesterday. Did they [VEGA's couriers] give it to you?" SANCHEZ replied, "Yes, I already paid him [VEGA] today." MARTINEZ stated, "And you have one pending, right cousin." SANCHEZ replied, "The one [one kilogram of heroin] they gave me

---

[26] According to CS-1, on February 3, 2014, CS-1 met SANCHEZ in the vicinity of the 4300 block of N. Sawyer Avenue in Chicago. This meeting was not recorded by LEOs. According to CS-1, during this meeting, SANCHEZ told CS-1 that his Blackberry PIN was 2A922D8E (Target Device 3). The identification of SANCHEZ as the user of Target Device 3 was corroborated by the content of the intercepted BBM communications on Target Device 3.

day before yesterday I will pay for tomorrow." MARTINEZ responded, "Thank you, because we are doing the math here but take care."

48.    On March 21, 2014, at approximately 7:42 p.m. (Session #4028505), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. During this conversation, SANCHEZ stated, "I have the paper [money for the heroin] already and they [VEGA's couriers] already took care of me again [provided SANCHEZ with an additional one kilogram of heroin]." MARTINEZ replied, "The one [one kilogram of heroin] you told me was pending and you paid for another [another quantity of heroin] aside from that?" SANCHEZ stated, "I paid for one [one kilogram of heroin] yesterday. And, I have enough [enough money] for the other [one kilogram of heroin received by SANCHEZ on March 18, 2014]. And, they [VEGA's couriers] already gave me another [another kilogram of heroin] today." MARTINEZ stated, "When you told me that you wanted one [one kilogram of heroin] that you could pay for right away, how much of those [heroin] have you paid for?" SANCHEZ replied, "I paid it right away."

49.    Based on the above-described BBM communications, I believe that on March 19, 2014, VEGA's narcotics couriers delivered one kilogram of heroin to SANCHEZ, who paid for the heroin on March 20, 2014. MARTINEZ further requested that VEGA provide SANCHEZ with an additional one kilogram of narcotics on March 21, 2014 since SANCHEZ was prompt with his previous payment to VEGA. SANCHEZ confirmed that he had already paid VEGA for the one kilogram of heroin he received on March 19, 2014, and that he planned to pay

for the additional one kilogram of heroin that he received from the VEGA DTO prior to March 19, 2014. SANCHEZ also indicated that VEGA's couriers provided him with an additional one kilogram of heroin on March 21, 2014.

> *On March 25, 2014, MARTINEZ Directed SANCHEZ to Deliver Narcotics Proceeds to Individual A.*

50. On March 24, 2014, at approximately 2:33 p.m. (Session #4038183), MARTINEZ, using Target Device 1, had a BBM conversation with VEGA, who was using Vega Device 2. In that conversation, VEGA stated, "Look, tell your guy [Individual A] to get a move on with the truck thing." VEGA further stated, "I need it, the one [vehicle with hidden compartments] that fits various [various amounts of drugs and drug proceeds]. Call him [Individual A]."

51. On March 25, 2014, at approximately 3:15 p.m. (Session #4042527), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, SANCHEZ asked, "When are you going to send your relative [a drug courier] for the paper [to pick up narcotics proceeds]?" MARTINEZ replied, "Cousin, would you do me the favor of giving it [narcotics proceeds] to the guy who lives in the same place as you? My buddy, the mechanic [Individual A], there. Do me a favor if you can, please." SANCHEZ replied, "Okay, send me his number." MARTINEZ stated, "Okay, thank you. 7 7 3 7 9 1 3 5 9 4. Tell him [Individual A] it's on behalf of the *primo*." SANCHEZ responded, "I will bring it [the narcotics proceeds] to him [Individual A] tomorrow. I did not bring my car. I will have it [deliver the narcotics proceeds to Individual A] tomorrow. That way, there's no problem since, as you know, my neighborhood is

full of police." MARTINEZ stated, "Thank you. Be careful. He [Individual A] is a mechanic, have him open your glove box; receive it [the narcotics proceeds] so we don't look bad. You know how things are done."

52. On March 27, 2014, at approximately 7:25 p.m. (Session #4052368), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, SANCHEZ stated, "I have already given the paper [narcotics proceeds] to your buddy [Individual A]."

53. On March 28, 2014, LEOs reviewed the surveillance footage from the pole camera installed at 2337 N. Monitor Ave, Chicago, Illinois. In the surveillance footage from March 27, 2014, at approximately 7:21 p.m., a Jeep Wrangler bearing Illinois license 80028FF and registered to ROBERTO SANCHEZ (the "Jeep"), arrived in the alley adjacent to the garage associated with 2337 N. Monitor Avenue. SANCHEZ exited the Jeep, opened the hood, and walked around to the front passenger side of the vehicle. Shortly thereafter, Individual A came out of the residence at 2337 N. Monitor Avenue and met with SANCHEZ near the front passenger side of the Jeep, by the vehicle's hood.

54. Based on the above-described intercepted BBM communications and physical surveillance, I believe that VEGA directed MARTINEZ to obtain a vehicle with hidden compartments so the VEGA DTO could transport drugs and drug proceeds. MARTINEZ reached out to SANCHEZ and requested that SANCHEZ deliver narcotics proceeds owed to MARTINEZ to Individual A as payment to Individual A for building a truck with hidden compartments for MARTINEZ and

VEGA. MARTINEZ further instructed SANCHEZ to have Individual A appear to inspect SANCHEZ's car so the transaction would not look suspicious. SANCHEZ and Individual A then met and Individual A took the narcotics proceeds from SANCHEZ.

> *On April 4, 2014, SANCHEZ Received Heroin from the VEGA DTO and MARTINEZ Directed SANCHEZ to Deliver $5,000 of Narcotics Proceeds to Individual A.*

55.     On April 4, 2014, at approximately 12:19 p.m. (Session #4087453), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, SANCHEZ stated, "I have the check [money for narcotics] now."

56.     Continuing on April 4, 2014, at approximately 12:40 p.m. (Session #4087686), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. MARTINEZ stated, "Okay, cousin. Could you take out just five [$5,000] please?" SANCHEZ replied, "I am going to take out the 1,500 [$1,500] that you owe me."

57.     Continuing on April 4, 2014, at approximately 12:42 p.m. (Session #4087783), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. MARTINEZ stated, "Okay, cousin." SANCHEZ stated, "Because I need to by [buy] some engines [narcotics] and I don't have enough." MARTINEZ replied, "Yeah, cousin, that's fine."

58.     Continuing on April 4, 2014, at approximately 1:20 p.m. (Session #4087924), MARTINEZ, using Target Device 1, had a BBM conversation with

SANCHEZ, who was using Target Device 3. In that conversation, SANCHEZ stated, "I've been taken care of again [received narcotics from VEGA DTO]."

59. Continuing on April 4, 2014, at approximately 4:39 p.m. (Session #4089302), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, MARTINEZ asked, "Cousin, are you handing in the check [paying for heroin] today or did they [VEGA's couriers] only give you work [heroin]?" SANCHEZ replied, "They [VEGA's couriers] are going to come by tomorrow but I have it [money for the heroin]. And, they [VEGA's couriers] took care of me [provided heroin] as well." MARTINEZ stated, "Okay, don't forget to take out the five [$5,000 of narcotics proceeds] cousin. Please, if you can, do me the favor." SANCHEZ replied, "Okay cousin, you got it. Should I give it [$5,000 of narcotics proceeds] to the same guy [Individual A]?" MARTINEZ responded, "If you can do me a huge favor, I would appreciate it. When are you going to give it [$5,000 of narcotics proceeds] to my buddy [Individual A], cousin?" SANCHEZ stated, "Tomorrow afternoon."

60. Continuing on April 6, 2014, at approximately 4:12 p.m. (Session #4102413), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. SANCHEZ stated, "Tomorrow I will leave it [$5,000 of narcotics proceeds] with your friend [Individual A], what you ordered me to do."

61. Continuing on April 7, 2014, at approximately 7:01 p.m. (Session #4110477), MARTINEZ, using Target Device 1, had a BBM conversation with

30

SANCHEZ, who was using Target Device 3. SANCHEZ stated, "I dropped the order [$5,000 of narcotics proceeds] off with your buddy already."

62.     Pole camera surveillance footage of 2337 N. Monitor Avenue, Chicago, Illinois showed that on April 7, 2014, at approximately 6:54 p.m., the Jeep arrived in the alley next to the garage of 2337 N. Monitor Avenue, Chicago, Illinois. Individual A exited the gate of the residence and walked up to the front passenger side door of the Jeep. The front passenger side door of the vehicle opened and closed, and Individual A returned inside the gate of the residence. The Jeep then left the area.

63.     Based on the above-described intercepted BBM communications and physical surveillance, I believe that SANCHEZ indicated that he had money to pay MARTINEZ for heroin and that he also received a quantity of narcotics from the VEGA DTO. MARTINEZ requested that SANCHEZ take $5,000 out of the drug proceeds owed to MARTINEZ and deliver the money to Individual A as payment to Individual A for building a truck with hidden compartments for MARTINEZ and VEGA. SANCHEZ then delivered MARTINEZ's narcotics proceeds to Individual A.

> *On April 4, 2014, MARTINEZ Directed SANCHEZ to Deliver $20,000 in Narcotics Proceeds to VEGA's Nephew.*

64.     On April 4, 2014, at approximately 4:56 p.m. (Session #4089412), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. MARTINEZ stated, "Cousin, check it [the heroin] out properly before you open it, cousin, so you can see what it actually is. Cousin, don't take it the wrong way. Only, if they [the heroin] are short then let the guy [VEGA's

courier] see that they [the heroin] are short, okay? And, the doves [cocaine] are on their way, cousin. You'll have it from two sides [cocaine and heroin] with me. It's from the same company [the GUDTO], only you know that they [the GUDTO], only bring up two, by three [23 kilograms of narcotics]." SANCHEZ replied, "The thing is they [the narcotics] lose weight when you take them out of the box. They come kind of fresh, it lowers when it [the narcotics] dries."

65.     Continuing on April 4, 2014, at approximately 5:04 p.m. (Session #4089467), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, MARTINEZ stated, "Exactly, so tell your guy [VEGA's courier] so they [the GUDTO] won't get upset over here with me. Look, you know I don't get upset anyway, you know it cousin, when I give you the white kind [the cocaine]." SANCHEZ responded, "Ninja [VEGA][27] already took it down [decreased the price of the cocaine] for me." MARTINEZ stated, "I am here with him [VEGA], cousin. He [VEGA] is asking that you give us a hand and when the doves [cocaine] arrive, he [VEGA] won't let you down, cousin. Okay?" MARTINEZ further stated, "Cousin, could I send a guy to pick up twenty [$20,000] over there with [Individual E]?[28] It's just to pick up, only." SANCHEZ asked, "Who is it? The same guy who picks up? That way he could take all of it at once." MARTINEZ responded, "The thing is it is a guy who is going to pay some money from the company over here [the $20,000 is for an individual associated with the GUDTO in Mexico who is going to purchase narcotics with the

---

[27] VEGA's previous Blackberry screen names included "Ninja."

[28] According to CS-1, Individual E is a mutual friend of CS-1 and SANCHEZ's.

money and also make a separate narcotics payment to the GUDTO in Mexico]." SANCHEZ replied, "Twenty big ones [$20,000]." MARTINEZ stated, "Yeah, cousin." SANCHEZ responded, "Okay, what time will he come by?" MARTINEZ stated, "Well, look, I am going to call him right now."

66. Continuing on April 4, 2014, at approximately 5:18 p.m. (Session #4089588), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, MARTINEZ stated, "He's the nephew of Ninja [the individual who will pick up the $20,000 from Individual E is VEGA's nephew]. He says he'll arrive in an hour so he won't let you down." SANCHEZ stated, "Let me know so I can let [Individual E] know. He [Individual E] lives in back now." MARTINEZ replied, "I'll have him [VEGA's nephew/courier] go behind the cermack [Cermack]."[29] SANCHEZ stated, "Yes, that's fine. The code for him [VEGA's nephew/courier] to ask for *Porfirio*."

67. Based on the above-described intercepted BBM communications, I believe that MARTINEZ directed SANCHEZ to check the amount of heroin that SANCHEZ received from the VEGA DTO. MARTINEZ also indicated that he would supply SANCHEZ with heroin and cocaine. MARTINEZ then requested that SANCHEZ arrange for Individual E to deliver $20,000 of narcotics proceeds, owed

---

[29] The garage associated with Individual E's residence at 4221 N. Sawyer Avenue, Chicago, Illinois is adjacent to a store called Cermack Produce. Based on the intercepted BBM communications between MARTINEZ and SANCHEZ, I believe that VEGA's courier planned to wait near or in Cermack Produce for Individual E to deliver the $20,000 of narcotics proceeds.

by SANCHEZ to MARTINEZ, to VEGA's nephew so that MARTINEZ's narcotics associate in Mexico could use the money to obtain narcotics in Mexico.

> *Between April 9, 2014 and April 17, 2014, SANCHEZ Received Narcotics from the VEGA DTO.*

68.     On April 9, 2014, at approximately 7:07 p.m. (Session #4125226), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, SANCHEZ stated, "They [VEGA's narcotics couriers] took care of me." MARTINEZ replied, "Okay cousin, be careful."

69.     Continuing on April 17, 2014, at approximately 8:16 p.m. (Session #4181362), MARTINEZ, using Target Device 1, had a BBM conversation with SANCHEZ, who was using Target Device 3. In that conversation, MARTINEZ stated, "Cousin, I went to bring some things. What's up?" SANCHEZ replied, "I already handed in the check [paid for narcotics] and they [VEGA's narcotics couriers] took care of again [provided SANCHEZ with narcotics]." MARTINEZ stated, "Okay, all set, cousin. We'll be in touch."

70.     Continuing on April 17, 2014, at approximately 8:18 p.m. (Session #4181363), MARTINEZ, using Target Device 1, had a BBM conversation with VEGA, who BBM PIN 2823BC76 ("Target Device 2").[30]  MARTINEZ stated, "Cousin, my guy [SANCHEZ] delivered [paid for narcotics received from the VEGA DTO]."

---

[30] The identification of VEGA as the user of Target Device 2 is based on the content of intercepted BBM conversations over Target Device 1, common call analysis between VEGA's previous BBM PIN (Vega Device 2) and Target Device 2, and the fact that Target Device 2 had the same Blackberry screen name – "Comando" – that was used for Vega Device 2.

71. Based on the above-described intercepted BBM communications, I believe that SANCHEZ informed MARTINEZ that he was provided narcotics by VEGA's narcotics couriers and that he also paid VEGA's couriers for the narcotics he received.

**B. In April 2014, VEGA and MARTINEZ Directed Couriers FIGUEROA, BETANCOURT, and FLORES-SANTOS to Pick Up Narcotics Proceeds from Various Individuals.**

*On April 16, 2014, FIGUEROA and BETANCOURT Delivered Narcotics Proceeds to, and Picked Up a Vehicle with Hidden Compartments from, Individual A.*

72. On April 15, 2014, at approximately 10:54 a.m. (Session #4165891), MARTINEZ, using Target Device 1, had a BBM conversation with FIGUEROA, who was using BBM PIN 334E508A ("Figueroa Device 2").[31] In that conversation, MARTINEZ asked, "Did you go and bring the truck yet because my friend [Individual A] needs the space in his garage?" FIGUEROA replied, "Yo, but tomorrow. Today is a day off." MARTINEZ stated, "7 7 3 7 9 1 3 5 9 4. That is my friend's [Individual A's] number. Tell him you are going on behalf of the cousin and 200 dollars are owed." FIGUEROA replied, "Okay." MARTINEZ further stated, "He [Individual A] is only owed 200 [$200] okay?"

---

[31] The identification of FIGUEROA as the user of Figueroa Device 2 is based on the following: (a) pen register data and consensually recorded BBM conversations between CS-1 and MARTINEZ, which led LEOs to determine that FIGUEROA's previous BBM PIN was 334B7A49 ("Figueroa Device 1"); (b) Figueroa Device 1, which had the BBM screen name, "Maddog," was intercepted over Target Device 1, used by MARTINEZ; and (c) Figueroa Device 2 had the same screen name, "Maddog."

73.     Continuing on April 16, 2014, at approximately 10:39 a.m. (Session #4172148), MARTINEZ, using Target Device 1, had a BBM conversation with FIGUEROA, who was using BBM PIN 334E508A.    In that conversation, MARTINEZ asked, "What's happening?"    FIGUEROA replied, "Your friend [Individual A] is asking if you can call him." MARTINEZ stated, "Okay, are you with him right now?  FIGUEROA responded, "No."  MARTINEZ further stated, "Are you going to go get the truck?"  FIGUEROA replied, "I want to go but they won't tell where it is.  Do you know?"  MARTINEZ stated, "Okay, I'll call him [Individual A] right now."   MARTINEZ later stated, "Don't forget to give him [Individual] 200 dollars, okay my friend?"   FIGUEROA replied, "Okay, sure." MARTINEZ stated, "I already called.  Okay, it's on fulerton [Fullerton] and minitor [Monitor]."

74.     Pole camera surveillance footage of 2337 N. Monitor Avenue, Chicago, Illinois showed that on April 16, 2014, at approximately 4:48 p.m., an Acura sports utility vehicle bearing Illinois license V331444 (the "Acura SUV") arrived by the garage associated with 2337 N. Monitor Avenue.[32]  FIGUEROA exited the driver's side of the Acura SUV and walked inside the garage.  At approximately 5:03 p.m., FIGUEROA exited the garage, entered the Acura SUV, and departed the location. At approximately 5:18 p.m., a red Chrysler Pacifica (the "Chrysler Pacifica") came

---

[32] According to Illinois Secretary of State records, in April 2014, the Acura SUV was registered to ELISEO BETANCOURT, 1010 Trask Street, Aurora, Illinois.  The Acura SUV currently has Illinois license E246944 and is registered to Individual H, 641 Grand Avenue, Aurora, Illinois.  Other than BETANCOURT and Individual H, the Acura SUV had two prior registered owners – FIGUEROA at 641 Grand Avenue, Aurora, Illinois and Individual K at 803 Magnolia Drive, North Aurora, Illinois.

out of the garage at 2337 N. Monitor Avenue.[33]  Individual A exited the Chrysler Pacifica and re-entered the garage.  At approximately 5:40 p.m., FIGUEROA walked toward the garage carrying a white plastic bag in his hand.  FIGUEROA was with BETANCOURT.[34]  Both FIGUEROA and BETANCOURT then entered the garage. A few minutes later, Individual A put a license plate on the rear of the Chrysler Pacifica.  At approximately 5:48 p.m., BETANCOURT and FIGUEROA entered the Chrysler Pacifica and traveled away from the location.

75.    Based on the above-described intercepted BBM communications and physical surveillance, I believe that FIGUEROA, at MARTINEZ's direction, delivered $200 of narcotics proceeds to Individual A.    FIGUEROA and BETANCOURT also picked up the Chrysler Pacifica, which LEOs later determined was outfitted with hidden compartments.

> *On April 26, 2014, VEGA Directed FIGUEROA to Pick Up $323,000 in Narcotic Proceeds from FNU LNU, a/k/a "Alan."*

76.    On April 26, 2014, at approximately 3:22 p.m. (Session #4233673), VEGA, using Target Device 2, had a BBM conversation with BBM PIN 334B22ED, believed to be used by FIGUEROA ("Figueroa Device 3").[35]    During that

---

[33] As detailed further below in paragraph 164, LEOs observed a hidden compartment within this Chrysler Pacifica.  In addition, as further described below in paragraph 225, LEOs approached Individual C on June 10, 2014 and found approximately 31 kilograms of heroin in the Chrysler Pacifica that Individual C was driving.

[34] On September 26, 2014, LEOs identified BETANCOURT pursuant to a traffic stop of BETANCOURT, who was identified by his Wisconsin driver's license.

[35] The identification of FIGUEROA as the user of Figueroa Device 3 is based on the following: (a) FIGUEROA was identified as the user of Figueroa Device 2 based on pen register data, consensually recorded BBM conversations between CS-1 and MARTINEZ, and a common call analysis between Figueroa Device 2 and Figueroa Device 1; and (b) Figueroa Device 2 had the same screen name, "MADDOG," as Figueroa Device 1.  Pen

conversation, VEGA asked, "Did you go pick up [narcotics proceeds] with *Paisa* [SANCHEZ] yet?"[36] FIGUEROA replied, "No." VEGA stated, "Okay. Go pick up M's [Individual F's narcotics proceeds] so they [the money] can be turned in." FIGUEROA replied, "Okay. Can you give me the number for M's?" VEGA responded, "Okay."

77. On April 26, 2014, at approximately 3:59 p.m. (Session #4233944), VEGA, using Target Device 2, had a BBM conversation with Blackberry PIN 2A75C94C, believed to be used by Individual F.[37] In that conversation, Individual F stated, "7 0 8 5 0 1 2 1 4 9. He [FIGUEROA] should ask for Alan; this one [narcotics proceeds] is ready." VEGA replied, "Okay."

78. On April 26, 2014, at approximately 4:01 p.m. (Session #4233945), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 3. In that conversation, VEGA stated, "7 0 8 5 0 1 2 1 4 9. Ask for Alan. He is ready." FIGUEROA replied, "Okay."

---

register data for Figueroa Device 2 showed no activity on Figueroa Device 2 after April 26, 2014. However, on that same day, Figueroa Device 3 with the screen name of "MADDOG" was intercepted over Target Device 2.

[36] According to CS-1, "Paisa" is one of the Blackberry screen names for SANCHEZ. Furthermore, in intercepted BBM conversations over Target Device 1 and Target Device 2, MARTINEZ and VEGA refer to SANCHEZ as "Paisa."

[37] Based on information from Mexican law enforcement, the DEA in Mexico City, Mexico, and court-authorized interceptions of Blackberry PINs used by VEGA and Individual F, LEOs determined that Individual F was the leader of the GUDTO in Mexico. On or about April 29, 2014, Individual F was arrested in Mexico by Mexican law enforcement and military authorities. Based on the intercepted communication described in paragraph 76 above where VEGA refers to "M's" narcotics proceeds, I believe that VEGA was referring to Individual F, whose first name begins with the letter "M."

79. Continuing on April 26, 2014, at approximately 6:06 p.m. (Session #4234570), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 3. During that conversation, FIGUEROA stated, "Okay, finished with Alan. It's 323 [$323,000]. I'm heading over to Paisa [SANCHEZ] now." VEGA replied, "Let me know when you guys are at the warehouse."

80. Pole camera surveillance footage showed that on April 27, 2014, at approximately 6:55 a.m., FIGUEROA left his residence at 641 Grand Avenue, Aurora, Illinois in a silver Acura (the "silver Acura"). Based on intercepted conversations over Target Device 2 and location information for a telephone used by FIGUEROA,[38] LEOs subsequently established surveillance at 850 Ridgeway Avenue, Aurora, Illinois at approximately 7:30 a.m., where they observed FIGUEROA and WILFREDO FLORES-SANTOS at a warehouse at that location.[39]

81. Based on the above-described intercepted BBM communications and surveillance, I believe that FIGUEROA and FLORES-SANTOS took the $323,000 of narcotics proceeds that FIGUEROA previously picked up from FNU LNU, a/k/a

---

[38] This telephone number was (331) 454-4728, which was the telephone number associated with Figueroa Device 2.

[39] The identification of FLORES-SANTOS is based on the following: On February 18, 2014, LEOs conducted a traffic stop of FIGUEROA and another male individual. Pursuant to a consent search of the vehicle, LEOs found what appeared to be used vacuum-sealed bags in the shape of rectangular bricks that contained a white, powdery residue. LEOs determined that there was an odor of cocaine emitting from the bags. The male individual in the vehicle with FIGUEROA identified himself during the traffic stop as WILFREDO FLORES-SANTOS. Based on a surveillance photograph of this male individual from the traffic stop, LEOs determined that the male individual observed with FIGUEROA at the warehouse at 850 Ridgeway Avenue, Aurora, Illinois on April 27, 2014 was the same person who was with FIGUEROA during the traffic stop conducted on February 18, 2014.

"Alan," to the warehouse at 850 Ridgeway Avenue, Aurora, Illinois ("Warehouse 1"). As described further below, based on physical surveillance, prior interceptions of BBM communications over Target Device 4, used by VEGA, and telephone location information for Target Device 7, used by FIGUEROA, LEOs determined that commercial passenger buses containing narcotics arrive at Warehouse 1 and another warehouse located at 496 S. River Street, Batavia, Illinois ("Warehouse 2"), where FIGUEROA, FLORES-SANTOS, BETANCOURT, and others unload narcotics off the buses and load them into vehicles, some of which have concealed compartments, as well as store narcotics and narcotics proceeds.

> *On April 27, 2014, VEGA Directed FIGUEROA to Pick Up $47,700 in Narcotics Proceeds from SANCHEZ.*

82.    On April 26, 2014, at approximately 7:10 p.m. (Session #4235937), VEGA, using Target Device 2, had a BBM conversation with SANCHEZ, who was using Target Device 3.    In that conversation, VEGA stated, "Cousin, the guy [FIGUEROA] got busy, but he can go pick up [narcotics proceeds] from you tomorrow." SANCHEZ replied, "Okay, it's set.  I may have the other paper for him by Tuesday."

83.    On April 27, 2014, at approximately 11:19 p.m. (Session #4239760), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 3.  In that conversation, VEGA stated, "Alex, when you're finished go to *Paisa* [SANCHEZ]." FIGUEROA replied, "Okay."

84.    On April 27, 2014, at approximately 1:24 p.m. (Session #4240251), SANCHEZ, using Target Device 3, had a BBM conversation with FIGUEROA, who

was using Figueroa Device 3. SANCHEZ asked, "You coming?" FIGUEROA replied, "Yeah, like in 30 [30 minutes] I'll be there." SANCHEZ stated, "Okay."

85. Pole camera surveillance footage of Individual E's residence at 4221 N. Sawyer Avenue, Chicago, Illinois on April 27, 2014, at approximately 1:46 p.m., showed SANCHEZ by the rear garage of the residence typing on a Blackberry device. At approximately 1:58 p.m., Individual E opened the door to the garage. SANCHEZ and Individual E entered the garage and both came out shortly thereafter. At approximately 2:06 p.m., FIGUEROA, driving the Acura SUV, parked the vehicle in front of the door of the main garage of the residence. FIGUEROA walked in the direction of the side door of the garage. Approximately six minutes later, FIGUEROA and SANCHEZ exited the garage and engaged in conversation.

86. On April 27, 2014, at approximately 2:13 p.m. (Session #4240493), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 3. During that conversation, VEGA stated, "8 7 2 2 1 4 5 4 7 7. Ask for superman ... give him all of them [a quantity of narcotics]." FIGUEROA replied, "Okay." VEGA then asked, "Did you already with *Paisa* [SANCHEZ]?" FIGUEROA replied, "I'm right here."

87. Continuing on April 27, 2014, at approximately 2:23 p.m. (Session #4240500), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 3. FIGUEROA stated, "I already picked up from *Paisa* [SANCHEZ], there are 47700 [$47,700 in narcotics proceeds]."

VEGA replied, "Okay. Look, send me the list of whatever you sent me last week [list of narcotics proceeds that FIGUEROA previously picked up and sent to VEGA]." FIGUEROA stated, "Okay. I'll send it [the list of proceeds] to you when I get home."

88.     Based on the above-described intercepted BBM communications and physical surveillance, I believe that VEGA directed FIGUEROA to pick up narcotics proceeds from SANCHEZ as payment for narcotics that SANCHEZ previously received from the VEGA DTO. FIGUEROA met SANCHEZ, who was with Individual E, and picked up $47,700 from SANCHEZ. VEGA also passed the telephone number of an individual named "superman" and directed FIGUEROA to contact this individual to deliver narcotics.

### C.     On April 26, 2014, SANCHEZ Received One Kilogram of Heroin from the VEGA DTO, which SANCHEZ Intended to Sell to His Customer MANDUJANO.

89.     On April 25, 2014, at approximately 3:33 p.m. (Session #4225993), SANCHEZ, using Target Device 3, had a BBM conversation with VEGA, who was using Target Device 2. SANCHEZ stated, "I have the tickets [money for heroin]. Can you send the guy [a courier]?" VEGA replied, "It's set."

90.     On April 25, 2014, at approximately 3:38 p.m. (Session #4225994), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 2. In that conversation, VEGA asked, "Can you go to *Paisa* [SANCHEZ] and pick something [narcotics proceeds] up?"

91.     Continuing on April 25, 2014, at approximately 3:40 p.m. (Session #4226133), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 2. In that conversation, FIGUEROA

stated, "Yes." VEGA stated, "Okay. Don't put them on [load narcotics proceeds onto the bus] until we gather more [additional proceeds from VEGA's narcotics customers]." FIGUEROA replied, "But the guys [other narcotics customers] are going to come for the work [narcotics] already, right now." VEGA stated, "Call maddonals [FNU LNU, a/k/a "MCDONAL"]." FIGUEROA responded, "And I have to go and fix the alternator." VEGA stated, "First go and fix the alternator and then you go pick up [narcotics proceeds from SANCHEZ]." FIGUEROA replied, "Okay."

92.     On April 25, 2014, at approximately 3:41 p.m. (Session #4226135), SANCHEZ, using Target Device 3, had a BBM conversation with VEGA, who was using Target Device 2. In that conversation, SANCHEZ stated, "Let me know what time they'll [VEGA's narcotics couriers] take care of me [provide heroin]." VEGA replied, "I already told macdog [FIGUEROA] to go and pick up [the narcotics proceeds from SANCHEZ]. SANCHEZ then asked, "He's [FIGUEROA's] going to take care of [provide heroin to] me too?" VEGA replied, "Yes buddy. Like always." SANCHEZ responded, "Okay, it's set."

93.     On April 25, 2014, at approximately 3:43 p.m. (Session #4226136), VEGA, using Target Device 2, had a BBM conversation with FNU LNU, a/k/a "MCDONAL," VEGA's narcotics courier, who was using BBM PIN 334B3370.[40] VEGA asked, "Buddy, can you please give one [one kilogram of heroin] to *paisa* [SANCHEZ]?" MCDONAL replied, "Okay. Of the 9 [nine kilograms of heroin] from the ones [heroin] that just arrived? From the ones [heroin] that arrived, 2 of them

---

[40] "MCDONAL" is the Blackberry screen name for the user of BBM PIN 334B3370.

[two kilograms of heroin] are a little better." VEGA stated, "Yes, first those [one kilogram of heroin to SANCHEZ] and then the rest. So we don't get the accounts mixed up." MCDONAL replied, "Okay."

94. On April 25, 2014, at approximately 9:10 p.m. (Session #4230270), SANCHEZ, using Target Device 3, had a BBM conversation with VEGA, who was using Target Device 2. In that conversation, SANCHEZ stated, "They [VEGA's narcotics couriers] didn't take care [provide heroin] of me. They said until tomorrow." SANCHEZ further stated, "I'll let you know when they take care of me." VEGA replied, "Okay, alright then."

95. On April 25, 2014, at approximately 9:28 p.m. (Session #4230375), SANCHEZ, using Target Device 3, had a BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370. SANCHEZ stated, "If it can be done earlier that would be better." MCDONAL replied, "That's what I'm going to try to do." SANCHEZ stated, "Please, do that for me." MCDONAL responded, "We'll be in contact."

96. Continuing on April 25, 2014, at approximately 10:00 p.m. (Session #4230530), SANCHEZ, using Target Device 3, had another BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370. MCDONAL stated, "Buddy, he [MCDONAL's narcotics courier] answered me already. He gets off work at 12:30. He says he will try to be there at 1:00 or a little after. What do you think?" SANCHEZ replied, "Earlier, if he can. Please." MCDONAL stated,

"Yes I told him that they will pick up the paper [narcotics proceeds] at 1:00, but he says he doesn't want to lie. He will try for the earliest as possible."

97.     Continuing on April 25, 2014, at approximately 10:04 p.m. (Session #4230645), SANCHEZ, using Target Device 3, had another BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370.   SANCHEZ stated, "I don't want them to take the paper [narcotics proceeds]."   MCDONAL replied, "Call your guy [SANCHEZ's narcotics customer].  Have him wait until 2:00, so he can give us a chance."  SANCHEZ asked, "Why don't you send the individual [MCDONAL's narcotics courier] who took care of me last time?"   MCDONAL responded, "He is not here."  SANCHEZ asked, "It's the one who is coming for the paper [narcotics proceeds]."   MCDONAL stated, "Oh, it's because he [MCDONAL's narcotics courier] dedicates himself completely to the paper [narcotics proceeds], that's why."  SANCHEZ requested, "Try early.  I don't want to lose it [referring to losing SANCHEZ's narcotics customer]. It's not a good time, right now, to let go of people who bring paper [narcotics customers who pay in advance for narcotics] as you know."   MCDONAL responded, "Yes, I'm going to hurry him."  SANCHEZ replied, "Okay, do that for me.  Thank you."

98.     On April 26, 2014, at approximately 11:05 a.m. (Session #4232440), SANCHEZ, who was using Target Device 3, had a BBM conversation with ISAIAS MANDUJANO, SANCHEZ's wholesale narcotics customer, who was using BBM

PIN 334DE74C.[41]  In that conversation, MANDUJANO asked, "What's going on, Paisa? Were you going to take a trip this way?"

99.    Continuing on April 26, 2014, at approximately 11:39 a.m. (Session #4232535), SANCHEZ, using Target Device 3, had a BBM conversation with MANDUJANO, who was using BBM PIN 334DE74C.  SANCHEZ replied, "Yes, later on."

100.    On April 26, 2014, at approximately 12:41 p.m. (Session #4232825), SANCHEZ, using Target Device 3, had a BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370.  SANCHEZ asked, "What happened, is he [MCDONAL's narcotics courier] coming before 1:00?  My buddy [MANDUJANO] is calling me.  What do I tell him, to pick up the money, or is the guy [MCDONAL's narcotics courier] going to arrive?"  MCDONAL replied, "I am checking on it."  SANCHEZ stated, "Let me know, if not, so that he [MANDUJANO] can leave, please."

101.    Continuing on April 26, 2014, at approximately 2:30 p.m. (Session #4233400), SANCHEZ, using Target Device 3, had another BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370.  SANCHEZ stated, "They [MCDONAL's narcotics couriers] arrived already [to deliver narcotics to SANCHEZ]."  MCDONAL replied, "Alright, and I apologize."  SANCHEZ stated,

---

[41] The identification of MANDUJANO as the user of BBM PIN 334DE74C is based on the following:  (a) as described further below in paragraphs 106-108, the user of BBM PIN 334DE74C arranged a meeting with SANCHEZ on April 27, 2014 and LEOs conducting surveillance of the meeting subsequently saw a male individual with SANCHEZ; and (b) LEOs compared an Illinois driver's license photograph of MANDUJANO to the male individual observed during the surveillance and determined it was the same person.

"Don't think I like bothering you. I did not want to let my buddy [MANDUJANO] down."

102. Based on the above-described intercepted BBM communications, I believe that VEGA arranged for FIGUEROA to pick up narcotics proceeds from SANCHEZ, which was payment for narcotics SANCHEZ previously received from the VEGA DTO. VEGA also instructed FNU LNU, a/k/a "MCDONAL," to deliver one kilogram of heroin to SANCHEZ so that SANCHEZ could sell the heroin to his customer, MANDUJANO.[42]

*On April 27, 2014, MANDUJANO Received One Kilogram of Heroin from SANCHEZ that SANCHEZ Received from the VEGA DTO.*

103. On April 26, 2014, at approximately 5:46 p.m. (Session #4234469), SANCHEZ, using Target Device 3, had a BBM conversation with MANDUJANO, who was using BBM PIN 334DE74C. SANCHEZ asked, "Can you come get it [heroin] yourself?" MANDUJANO replied, "What time? Where do I go?"

104. Continuing on April 26, 2014, at approximately 5:59 p.m. (Session #4234469), SANCHEZ, using Target Device 3, had another BBM conversation with MANDUJANO, who was using BBM PIN 334DE74C. SANCHEZ stated, "By Motros [Montrose] and Kedzie, early in the morning." MANDUJANO asked, "Do you want me to go today or tomorrow?" SANCHEZ responded, "I am going out with the lady in a little bit, early tomorrow, and I have it [heroin] over there where I told you."

---

[42] As described further below in paragraph 106, SANCHEZ informed MANDUJANO that he had one kilogram of heroin available.

105. On April 26, 2014, at approximately 7:13 p.m. (Session #4235934), SANCHEZ, using Target Device 3, had a BBM conversation with MARTINEZ, who was using BBM PIN 2A7D79FC.[43] In that conversation, SANCHEZ stated, "I was already taken care of [provided with narcotics], today." MARTINEZ replied, "Okay cousin, we will be in touch."

106. On April 26, 2014, at approximately 7:37 p.m. (Session #4236087), SANCHEZ, using Target Device 3, had a BBM conversation with MANDUJANO who was using BBM PIN 334DE74C. In that conversation, MANDUJANO stated, "III [requesting three kilograms of heroin]." SANCHEZ replied, "Only 1 [one kilogram of heroin]." MANDUJANO then asked, "What time do I stop by you tomorrow?" SANCHEZ replied, "Early, let me know an hour b4 [before] u get so I can b ready."

107. Continuing on April 27, 2014, at approximately 2:19 p.m. (Session #4240489), SANCHEZ, using Target Device 3, had a BBM conversation ith MANDUJANO, who was using BBM PIN 334DE74C. MANDUJANO stated, "I am by Kedzie." SANCHEZ replied, "Kedzie and what other one? Ketzie [Kedzie] and Cullon at the auto parts."

108. On April 27, 2014, at approximately 2:23 p.m., LEOs observed SANCHEZ exit the side door of the garage at 4221 N. Sawyer Avenue, Chicago,

---

[43] The identification of MARTINEZ as the user of BBM PIN 2A7D79FC is based on the following: (a) a common contact analysis between Target Device 1, used by MARTINEZ, and BBM PIN 2A7D79FC; and (b) use of the Blackberry screen name "Apaxtla," which is the same screen name MARTINEZ used while using Target Device 1.

Illinois.[44] SANCHEZ was holding a cellular telephone to his ear. Approximately two minutes later, SANCHEZ entered the rear gate of the residence with MANDUJANO. Both individuals then entered the side door of the garage of the residence and exited the garage shortly thereafter. At approximately 2:46 p.m., LEOs observed Individual E walk out of the main garage door and into the alley carrying a white plastic bag. Shortly thereafter, LEOs observed Individual E return inside the garage empty-handed.

109. Continuing on April 27, 2014, at approximately 5:23 p.m. (Session #4241380), SANCHEZ, using Target Device 3, had a BBM conversation ith MANDUJANO, who was using BBM PIN 334DE74C. In the conversation, MANDUJANO stated, "I arrived already. I am just waiting for him [MANDUJANO's narcotics customer] to come, and I will let you know either yes or no [whether the customer likes the heroin that MANDUJANO received from SANCHEZ]."

110. Based on the above-described intercepted BBM communications and physical surveillance, I believe that after SANCHEZ obtained the heroin from the VEGA DTO, SANCHEZ went to Individual E's residence where Individual E, at SANCHEZ's direction, met MANDUJANO and provided MANDUJANO with one kilogram of heroin.

---

[44] 4221 N. Sawyer Avenue is located approximately one-half block south of W. Cullom Avenue, Chicago, Illinois, and near an Auto Zone store.

**D.     On April 28, 2014, SANCHEZ Arranged for Individual E to Receive One Kilogram of Heroin from the VEGA DTO, which SANCHEZ Provided to His Customer MANDUJANO.**

*On April 28, 2014, VEGA Arranged for His Courier FNU LNU, a/k/a "MCDONAL," to Deliver One Kilogram of Heroin to SANCHEZ.*

111.    On April 27, 2014, at approximately 9:45 p.m. (Session #4244031), SANCHEZ, using Target Device 3, had a BBM conversation ith MANDUJANO, who was using BBM PIN 334DE74C. In that conversation, MANDUJANO stated, "The buddy [MANDUJANO's narcotics customer] says yes, but he will not give me the check [money for narcotics] until tomorrow. Let's see if I get a chance to go [pick up additional narcotics from SANCHEZ] tomorrow, if not, I will go Tuesday."

112.    On April 28, 2014, at approximately 9:41 a.m. (Session #4245915), SANCHEZ, using Target Device 3, had a BBM conversation with VEGA, who was using Target Device 2. In that conversation, SANCHEZ stated, "Do you remember the guy [MANDUJANO] that was asking for the photo [heroin]? ... He is offering 20 bucks [$20,000] now and the rest in 15 days. What do you think?" VEGA replied, "If he likes it [the heroin], give it to him." SANCHEZ stated, "Okay, once he [MANDUJANO] calls me to tell me that he is coming, I will let you know, so I can be taken care of [provided with heroin]." VEGA responded, "Okay, alright, it's set."

113.    On April 28, 2014, at approximately 11:55 a.m. (Session #4246545), SANCHEZ, using Target Device 3, had a BBM conversation ith MANDUJANO, who was using BBM PIN 334DE74C. In that conversation, MANDUJANO asked, "Hey." SANCHEZ replied, "Are you coming today or tomorrow?" MANDUJANO stated, "I think you will not work until tomorrow." SANCHEZ responded, "I don't think so,

50

it's going to rain. Let me know once you have the paper [money for narcotics] so I can put the order in [order narcotics from the VEGA DTO]." MANDUJANO replied, "Alright, I might as well bring the car with me."

114. On April 28, 2014, at approximately 5:23 p.m. (Session #4248878), SANCHEZ, using Target Device 3, had a BBM conversation with VEGA, who was using Target Device 2. In that conversation, SANCHEZ stated, "Send the guy so he [VEGA's courier] can take care of me [provide SANCHEZ with heroin]. My friend [MANDUJANO], the one for the 20 [$20,000] called me already." VEGA replied, "Okay."

115. On April 28, 2014, at approximately 5:24 p.m. (Session #4249110), SANCHEZ, using Target Device 3, had a BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370. In that conversation, SANCHEZ asked, "What time can you take care of me [provide heroin] today?" MCDONAL replied, "Let me check. I have to take care of another 2 [provide heroin to two other customers] more. Hold on." SANCHEZ stated, "But today please, because I'm going to meet with my friend [MANDUJANO] early tomorrow morning. The same that you had given me [the same amount of heroin previously given to SANCHEZ by MCDONAL]." MCDONAL responded, "Let me finish up with those [deliveries of narcotics to other customers] and then, more or less around 7:00 or 8:00."

116. On April 28, 2014, at approximately 5:30 p.m. (Session #4249235), VEGA, using Target Device 2, had a BBM conversation with FNU LNU, a/k/a

MCDONAL," who using BBM PIN 334B3370. In that conversation, MCDONAL stated, "*Paisa* [SANCHEZ] called me." VEGA replied, "Okay, but today you're going to give *primo*. Buddy attend the 1 of 5 [deliver one out of the five kilograms of heroin]." MCDONAL stated, "We're on that already, I'm waiting on the 1 of 5. What should I do with paisa [SANCHEZ] yes or no?" VEGA responded, "First the 1 of 5 [deliver the one out of the five kilograms of heroin to *primo* first] and then *paisa* [SANCHEZ]." MCDONAL stated, "Yes, that's set. The 1 of 5 is coming it's just that he [SANCHEZ] lives a little far."

117. Pole camera surveillance of 4221 N. Sawyer Avenue, Chicago, Illinois showed that on April 28, 2014, at approximately 7:08 p.m., Individual E exited the side door of the garage empty-handed and walked out of the rear gate of the residence. At approximately 7:23 p.m., a silver vehicle parked behind the gate of the residence. Approximately ten minutes later, the silver vehicle departed the location and Individual E entered the side door of the garage carrying a dark-colored object in his hand. Based on this surveillance and the intercepted BBM communications described above between MCDONAL and SANCHEZ and between VEGA and MCDONAL, I believe that the dark-colored object that Individual E was carrying was the heroin provided by MCDONAL, who arrived at 4221 N. Sawyer Avenue in the silver vehicle.

118. On April 28, 2014, at approximately 7:34 p.m. (Session #4250966), SANCHEZ, using Target Device 3, had a BBM conversation with FNU LNU, a/k/a "MCDONAL," who was using BBM PIN 334B3370. In that conversation,

MCDONAL asked, "Are you already there?" SANCHEZ replied, "Yes." MCDONAL then stated, "Alright then, we'll be right there."

119. On April 28, 2014, at approximately 7:36 p.m. (Session #4250977), VEGA, using Target Device 2, had a BBM conversation with FNU LNU, a/k/a MCDONAL," who was using BBM PIN 334B3370. MCDONAL stated, "It's a done deal with *Paisa* [heroin was delivered to SANCHEZ]." VEGA asked, "Did you give another one [one kilogram of heroin] to *paisa* [SANCHEZ]?" At approximately 7:45 p.m., in another intercepted BBM communication with VEGA (Session #4250983), MCDONAL replied, "Yeah."

120. On April 28, 2014, at approximately 7:51 p.m. (Session #4251106), SANCHEZ, using Target Device 3, had a BBM conversation with MARTINEZ, who was using BBM PIN 2A7D79FC. SANCHEZ stated, "I was taken care of again [provided with heroin] today."

121. Based on the above-described intercepted BBM communications and physical surveillance, I believe that SANCHEZ requested heroin from VEGA, who directed MCDONAL to deliver one kilogram of heroin to SANCHEZ. The heroin was then delivered to Individual E at 4221 N. Sawyer Avenue, Chicago, Illinois. SANCHEZ also informed MARTINEZ that the VEGA DTO had provided him with heroin.

> *On April 29, 2014, MANDUJANO Received One Kilogram of Heroin from SANCHEZ.*

122. On April 28, 2014, at approximately 7:51 p.m. (Session #4251105), SANCHEZ, using Target Device 3, had a BBM conversation with MANDUJANO,

who was using BBM PIN 334DE74C. In that conversation, MANDUJANO stated, "It's set." SANCHEZ asked, "What time are you coming?" MANDUJANO replied, "Around 9, 10, is that okay?" SANCHEZ stated, "If you can arrive at 10 it would be better." MANDUJANO responded, "Alright, I will let you know when I am on my way."

123. Continuing on April 29 2014, at approximately 9:41 a.m. (Session #4254383), SANCHEZ, using Target Device 3, had a BBM conversation with MANDUJANO, who was using BBM PIN 334DE74C. MANDUJANO stated, "I got off already." SANCHEZ replied, "Okay, I am here."

124. Pole camera surveillance footage at 4221 N. Sawyer Avenue, Chicago, Illinois showed that on April 29, 2014, at approximately 9:41 a.m., LEOs observed SANCHEZ, driving a Nissan sedan bearing Illinois license 78389FF, park in the parking lot of an Auto Zone store, located a block from 4221 N. Sawyer.[45] SANCHEZ then entered the backyard of 4221 N. Sawyer and entered the garage on the premises. Approximately four minutes later, LEOs observed MANDUJANO driving a silver Lexus, bearing Illinois license R66521, park near the garage at 4221 N. Sawyer.[46] MANDUJANO exited the Lexus and entered the garage with SANCHEZ. At approximately 9:51 a.m., LEOs observed SANCHEZ return to the Nissan parked at the Auto Zone. MANDUJANO entered the Lexus and drove the vehicle to the parking lot of the Auto Zone.

---

[45] According to Illinois Secretary of State records, the Nissan is registered to ROBERTO SANCHEZ, 1301 Auburn Court, Rockford, Illinois.

[46] According to Illinois Secretary of State records, this vehicle is registered to ISAIAS MANDUJANO, 2406 New Haven Ct., Rockford, Illinois.

125.    LEOs then observed the Nissan and Lexus travel to a Chase Bank at 3204 W. Irving Park Road, Chicago, Illinois. At the parking lot of the bank, LEOs observed SANCHEZ hand paperwork to MANDUJANO. MANDUJANO and a female individual ("Individual G"), who was a passenger in the Lexus, went to a Western Union across the street. At approximately 10:22 a.m., LEOs observed SANCHEZ enter the Nissan and MANDUJANO and the female individual enter the Lexus. Both vehicles then traveled to a residence at 3516 W. Irving Park Road, Chicago, Illinois. At that location, LEOs observed MANDUJANO drive a white Lincoln, bearing Illinois license V321456, out of the backyard of the residence.[47]

126.    LEOs further observed the Lexus and the Nissan travel back to the Auto Zone parking lot. MANDUJANO drove the Lincoln to the alley next to the garage of 4221 N. Sawyer. LEOs observed MANDUJANO exit the Lincoln and meet SANCHEZ by the vehicle. SANCHEZ then returned to the garage. Shortly thereafter, MANDUJANO drove the Lincoln to the parking lot of the Auto Zone. The Lincoln and the Lexus, driven by Individual G, then departed the area, traveling in the same direction. At approximately 10:54, the Chicago Police Department conducted a traffic stop on the Lexus. LEOs observed the Lincoln, driven by MANDUJANO, continue to travel to a parking lot of the Des Plaines Oasis off the 90/94 interstate highway. LEOs further observed that this parking lot was closed due to construction. MANDUJANO then entered a 7-11 store at the Oasis while talking on a cellular telephone. At approximately 11:18 a.m., the

---

[47] According to Illinois Secretary of State records, the Lincoln is registered to MANDUJANO's wife, Individual G, at 809 Corbin Street, Rockford, Illinois.

Lexus, driven by Individual G, arrived at the Des Plaines Oasis and MANDUJANO entered the front passenger seat of the vehicle. LEOs observed the Lexus travel to 809 Corbin Street, Rockford, Illinois.[48] Meanwhile, at the Des Plaines Oasis, a narcotics canine alerted several times on the exterior front passenger side area of the Lincoln. LEOs subsequently searched the Lincoln and did not find any contraband inside the vehicle. According to information obtained from the Illinois State Police, on April 30, 2014, the Lincoln was towed for being parked in an area with a two-hour parking limit. On or about November 20, 2014, LEOs learned that the Lincoln was never claimed from the tow yard and was salvaged.

127.    Based on the above-described intercepted BBM communications and physical surveillance, I believe that MANDUJANO picked up one kilogram of heroin from SANCHEZ, who received the heroin from the VEGA DTO. MANDUJANO received the heroin at the garage at 4221 N. Sawyer Avenue, Chicago, Illinois. MANDUJANO then put the heroin in the Lincoln, which he drove and later abandoned at the Des Plaines Oasis because he suspected law enforcement detection of his activities when the Lexus, driven by Individual G, was stopped by LEOs. Although LEOs did not recover any contraband from within the Lincoln, I believe that MANDUJANO either took the heroin with him when he left the Lincoln at the Des Plaines Oasis, or left the heroin in a hidden compartment within the Lincoln, which LEOs were unable to find during the search of the vehicle.

_____

[48] According to law enforcement databases, MANDUJANO is associated with 809 Corbin Street, Rockford, Illinois.

### E.  April 28, 2014, Intercepted Communications Between VEGA and Individual F Regarding Heroin that the VEGA DTO was to Deliver to Various Narcotics Customers.

128.  On April 28, 2014, at approximately 11:36 a.m. (Session #4246469), VEGA, using Target Device 2, had a BBM conversation with Individual F, believed to be the leader of the GUDTO, who was using BBM PIN 2A75C94C.  In that conversation, Individual F asked, "What's going on buddy?  Have they [narcotics couriers] made that delivery yet?"  VEGA replied, "No, the meeting was scheduled for 1 [1:00].  Call me on the other number."

129.  Continuing on April 28, 2014, at approximately 11:59 a.m. (Session #4246572), VEGA, using Target Device 2, had a BBM conversation with Individual F, who was using BBM PIN 2A75C94C.  During that conversation, Individual F stated, "For the 2 [two kilograms of heroin] orange, 630-215-5581."  VEGA asked, "Who should they ask for?"

130.  On April 28, 2014, at approximately 12:00 p.m. (Session #4246574), VEGA, using Target Device 2, had BBM conversation with FIGUEROA, who was using Figueroa Device 3.  During this conversation, FIGUEROA asked, "Are they [the heroin] all for superman [a narcotics customer]?"

131.  Continuing on April 28, 2014, at approximately 12:01 p.m. (Session #4246694), VEGA, using Target Device 2, had another BBM conversation with FIGUEROA, who was using Figueroa Device 3.  During this conversation, VEGA stated, "Yes, except the two [2 kilograms of heroin] that have orange tape.  Those are for someone else."  FIGUEROA replied, "Yes, but there are more orange ones."  VEGA stated, "How many?  Put Wili [WILFREDO FLORES-SANTOS] on."

132.    On April 28, 2014, at approximately 12:03 p.m. (Session #4246697), VEGA, using Target Device 2, had a BBM conversation with Individual F, who was using BBM PIN 2A75C94C.    In that conversation, VEGA stated, "Buddy, apparently there are more of the orange ones [heroin wrapped with orange tape]." Individual F responded, "There are only 2 [two kilograms of heroin wrapped with orange tape]."  Individual F further stated, "If there are more orange ones, check for 2 [two kilograms of heroin] that have an iguana that sticks out, it stands out as a bulge on the square."  VEGA asked, "Okay, there are 7 [seven kilograms of heroin]? Let me check."  Individual F replied, "It's 2 [two kilograms of heroin] that have a bulge, like an iguana.   There are only 2 [two kilograms of heroin] like that." Individual F further stated, "And they should ask for *Tio*."

133.    Based on the above-described intercepted BBM communications, I believe that VEGA received multiple kilograms of heroin from Individual F. Individual F then gave VEGA the telephone number of a narcotics courier named "*Tio*," who was to receive 2 kilograms of that heroin that was wrapped with orange tape and an iguana stamp.  VEGA then confirmed with FIGUEROA that the rest of the heroin was to be delivered to "superman," another narcotics customer.  Based on my training and experience and the experience of other LEOs, I know that narcotics suppliers frequently mark their narcotics with a particular label or stamp to identify which narcotics are to be delivered to which of the supplier's customers.

**F.      On April 28, 2014, at VEGA's direction, FIGUEROA and FLORES-SANTOS Sorted Through the Heroin Received from Individual F and Delivered 26 Kilograms of Heroin to Narcotics Customers.**

134.    As described above in paragraphs 128-129 and 132, after VEGA discussed with Individual F which narcotics were marked for the narcotics courier "Tio" and for another customer called "superman," VEGA instructed his courier FLORES-SANTOS to determine which kilograms had the iguana stamp because these kilograms needed to be delivered to the narcotics courier "Tio." On April 28, 2014, at approximately 12:05 p.m. (Session #4246698), VEGA, using Target Device 2, had BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.[49] During this conversation, VEGA asked, "Hey, how many of the orange ones are there?" FLORES-SANTOS replied, "There are seven [seven kilograms of heroin wrapped with orange tape]." VEGA stated, "The ones with orange tape, are there two different ones? Send me a picture." FLORES-SANTOS responded, "There are seven with orange tape." VEGA asked, "Are there two different ones? Send me a picture of the seven. If there are seven of them, then look for two [2 kilograms of heroin] that have an iguana stamp that sticks out. The iguana sticks out."

---

[49] The identification of FLORES-SANTOS as the user of BBM PIN 334DF84F is based on the following: On February 18, 2014, LEOs conducted a traffic stop on a vehicle and subsequently identified FLORES-SANTOS as a passenger in that vehicle. On May 9, 2014, LEOs observed FLORES-SANTOS at two locations in Aurora, Illinois, and one location in North Aurora, Illinois. Court-authorized location information obtained for a telephone number assigned to Blackberry PIN 334DF84F showed that the telephone was in the same locations as FLORES-SANTOS.

135. Continuing on April 28, 2014, at approximately 12:11 p.m. (Session #4246702), VEGA, using Target Device 2, received a BBM message from FLORES-SANTOS, who was using BBM PIN 334DF84F. That message was a photograph of seven, rectangular-shaped, black objects further wrapped in green cellophane wrapping. Each object had an orange area on top of the object. Based on my training and experience, the shape and packaging of these objects are consistent with the appearance of kilogram quantities of narcotics.

136. Continuing on April 28, 2014, at approximately 12:14 p.m. (Session #4246773), VEGA, using Target Device 2, had BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, VEGA stated, "Yeah, 2 [two kilograms of heroin] are different, their stamp sticks out. I can't see the photo." FLORES-SANTOS replied, "Hold on, I'm checking." VEGA asked, "What happened?" FLORES-SANTOS responded, "Look, there are 8 [eight kilograms of heroin] with green sticker, 12 orange-colored ones, 1 that says *Nacho*, and 5 that don't have a name. The iguana is indistinguishable on the orange ones. I'm going to have to open them. Or tell me what should I do?" VEGA replied, "Only the orange ones. Check them. M [Individual F] says that the iguana sticks out. Hey, check the rest to see which ones have the iguana that sticks out."

137. On April 28, 2014, at approximately 12:24 p.m. (Session #4246774), VEGA, using Target Device 2, had BBM conversation with FIGUEROA, who was using Figueroa Device 3. In that conversation, VEGA stated, "The 2 orange ones are for 6 3 0 2 1 5 5 5 8 1. Ask for *Tio*." FIGUEROA replied, "Okay."

138.  On April 28, 2014 at approximately 1:23 p.m. (Session #4247148), VEGA, using Target Device 2, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.  In that conversation, FLORES-SANTOS stated, "There is only 1 [one kilogram of heroin that has the iguana stamp]."

139.  Continuing on April 28, 2014 at approximately 1:24 p.m. (Session #4247275), VEGA, using Target Device 2, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.  VEGA stated, "There should be 2 [two kilograms of heroin with the iguana stamp].  FLORES-SANTOS replied, "There is only 1."  VEGA stated, "Check, so the hour doesn't pass.  The other one [one kilogram of heroin with the iguana stamp] is probably less noticeable."  FLORES-SANTOS replied, "I already checked.  You are going to get mad, but I opened all of them.  And the guy [narcotics customer] is already waiting."  VEGA stated, "It doesn't matter, just put tape on them so you can deliver the rest."  FLORES-SANTOS stated, "Only 1 [one kilogram of heroin] has it [the iguana stamp].  I'm here with Alex [FIGUEROA].  I already checked all of them."  VEGA responded, "Check it's 2 [two kilograms of heroin have the iguana stamp]."  VEGA later asked, "Is the other guy [narcotics customer] there yet, the one who is picking up at 1 [1:00]?"  FLORES-SANTOS replied, "Yes, the guy is waiting for us.  We already have his truck here with us."  VEGA stated, "Okay, go ahead.  Perhaps it doesn't look much like the other one.  Okay, put Alex [FIGUEROA] in charge of it [the narcotics delivery].  FLORES-SANTOS responded, "Man, I opened all of them [heroin] to see them."  FLORES-SANTOS later asked, "Should I get another of the

orange ones [heroin wrapped with orange tape]?" VEGA replied, "Yes, one that looks similar." FLORES-SANTOS asked, "But, weren't we looking for the iguana, but there is only 1 [one kilogram of heroin with the iguana stamp]." FLORES-SANTOS further stated, "Okay, but I have the guy [narcotics customer] from 1 [1:00] waiting." VEGA then stated, "Give him [the narcotics customer] that one [one kilogram of heroin with the iguana stamp] and another one [another kilogram of heroin] and deliver the rest. Let me know once you have delivered." FLORES-SANTOS replied, "Okay."

140. Based on the intercepted BBM communications described above in paragraphs 134-139, I believe that FIGUEROA and FLORES-SANTOS, at VEGA's direction, sorted through the heroin the VEGA DTO received from Individual F. VEGA then instructed FLORES-SANTOS to give "Tio," a narcotics courier, a total of two kilograms of heroin - one kilogram wrapped with the orange tape and iguana stamp and another kilogram of heroin. VEGA also gave FIGUEROA the telephone number for "Tio" so FIGUEROA and FLORES-SANTOS could deliver the two kilograms to this individual.

141. On April 28, 2014, at approximately 1:34 p.m. (Session #4247277), VEGA, using Target Device 2, had a BBM conversation with Individual F, who was using BBM PIN 2A75C94C. In that conversation, VEGA stated, "Buddy, of the orange ones [kilograms of heroin with orange tape], only 1 [one kilogram of heroin] has the iguana, and the other guy [the narcotics customer] is waiting. They [FIGUEROA and FLORES-SANTOS] already checked the orange ones and only 1

has the stamp." Individual F replied, "Give him [the narcotics customer] that one [one kilogram of heroin with the iguana stamp] and another one [another kilogram of heroin]." Individual F further stated, "And deliver the rest [of the remaining heroin].

142. On April 28, 2014 at approximately 1:58 p.m. (Session #4247337), VEGA, using Target Device 2, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. VEGA stated, "Let me know once you have delivered." FLORES-SANTOS replied, "Yeah, we still haven't." VEGA stated, "Okay, alright." FLORES-SANTOS later stated, "The trip is completed. It's done [FLORES-SANTOS and FIGUEROA delivered the heroin]."

143. On April 28, 2014 at approximately 2:04 p.m. (Session #4247338), VEGA, using Target Device 2, had a BBM conversation with FIGUEROA, who was using Figueroa Device 3. FIGUEROA stated, "Okay, finished with the 24 [delivered 24 kilograms of heroin]." VEGA replied, "Okay, good."

144. Based on the intercepted BBM communications described above, I believe that Individual F instructed VEGA to deliver two kilograms of heroin to "Tio" - one kilogram wrapped with the orange tape and another kilogram of heroin. VEGA then gave these instructions to FIGUEROA who delivered, with FLORES-SANTOS, the two kilograms of heroin as well as the remaining twenty-four kilograms of heroin to "superman," another narcotics customer.

### G. On June 1, 2014, the VEGA DTO Received 26 Kilograms of Heroin at Warehouse 2.

145. Based on intercepted BBM communications of VEGA, FLORES-SANTOS, and FIGUEROA, on May 30, 2014, at approximately 11:02 a.m., LEOs established surveillance at a warehouse at 850 Ridgeway Avenue, Aurora, Illinois ("Warehouse 1") and observed a passenger bus bearing the name "Monarca" ("Bus 1") arrive at the warehouse. Approximately ten minutes later, LEOs observed a second passenger bus ("Bus 2") bearing the name "Monarca" exit Warehouse 1. LEOs further observed FLORES-SANTOS drive Bus 2 to Warehouse 1's parking lot. FLORES-SANTOS then exited Bus 2 and entered Bus 1. Shortly thereafter, LEOs observed BETANCOURT at Warehouse 1. LEOs observed BETANCOURT and FLORES-SANTOS engaged in brief conversation. BETANCOURT then left Warehouse 1 driving the Acura SUV.

146. Later that day, at approximately 7:24 p.m. (Session #4433041), VEGA using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.[50] In that conversation, VEGA stated, "Take out the things [heroin], the stickers [heroin]. Put them [heroin] in the trunk of the white one [a white vehicle]." FLORES-SANTOS replied, "We put everything [all the heroin] in the red one [a red vehicle] and we loaded the Acura with stuff [heroin].

---

[50] The identification of VEGA as the user of Target Device 4 is based on the following: Pen register data showed that on May 2, 2014, VEGA ceased using Target Device 2. Information obtained from the U.S. Customs and Border Patrol showed that VEGA crossed the border from Mexico into the United States on May 2, 2014. On May 3, 2014, Target Device 3, used by SANCHEZ, received a BBM invitation from Target Device 4, to add Target Device 3 to Target Device 4's contact list. The BBM invitation read, "Cobra would like to add you to his or her Blackberry Messenger Contact List." "Cobra" was a Blackberry screen name previously used by VEGA.

It's outside already [the vehicles with the heroin are outside of a warehouse]." VEGA responded, "Okay, all right. Look, not in the red one. It's better if you put everything [all the heroin] in the trunk of the white one. It's outside [VEGA stating that the white vehicle is outside of Warehouse 1]. Put everything in the white one and we'll move it early [tomorrow]." FLORES-SANTOS stated, "We're not there anymore [not at Warehouse 1]. We're going to put them in Cowboy's car. I'll take care of that right now."

147. On May 30, 2014, at approximately 9:16 p.m. (Session #4436801), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1.[51]  In that conversation, FRANKLIN stated, "Your aunt [the passenger bus] gets here from 8 and 9 in the morning with the kids [heroin].  The other lady [the other passenger bus] arrives at 7 [7:00 a.m.] to 8 [8:00 a.m.]." VEGA replied, "Okay, alright. Is Adan going to give me the # [telephone number of individual picking up the heroin]?" FRANKLIN replied, "Yeah."

148. On May 30, 2014, at approximately 9:35 p.m. (Session #4436802), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E.[52] VEGA asked, "Buddy, can you get the number [telephone number of the individual picking up the heroin] so we can deliver?"

---

[51] "FRANKLIN" is the Blackberry screen name for the user of BBM PIN 7A6E50D1.

[52] "STAR" is the Blackberry screen name for the user of BBM PIN 2824C71E.  Based on intercepted BBM communications described below in paragraphs 175-176, 179, 187, 191-192 and 194, I believe that STAR is one of VEGA's narcotics suppliers.

149.    On May 30, 2014, at approximately 9:35 p.m. (Session #4436845), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.  In that conversation, VEGA stated, "The aunt [bus] arrives between 7 [7:00 a.m.] and 8 [8:00 a.m.] at the 1 [Warehouse 1].  The aunt [another bus] at the 2 [Warehouse 2] is bringing her nephews [heroin]." FLORES-SANTOS asked, "What do you know about the 2 [bus arriving at Warehouse 2]?  Did they check it or something like that?"  VEGA replied, "No, it's doing good."

150.    Continuing on May 30, 2014, at approximately 9:37 p.m. (Session #4436895), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.  FLORES-SANTOS asked, "What time is the 2 one [bus at Warehouse 2] arriving?"  VEGA replied, "Between 8 [8:00 a.m.] and 9 [9:00 a.m.].  You open up the one [open up Warehouse 1] and they [BETANCOURT and FIGUEROA] should go to the 2 [Warehouse 2]."  FLORES-SANTOS replied, "Do you want me to unload and load at the same time or what do you want me to do.  Or should 2 [bus at Warehouse 2] leave without the documentation [narcotics proceeds]."  VEGA responded, "We'll see about that early tomorrow, if the one [bus] that brings the check [narcotics proceeds] arrives." VEGA later instructed, "Go to 1 [Warehouse 1] and open up."  VEGA further stated, "If it's possible, we'll take it down [unload the heroin from the bus at Warehouse 1] and we'll put them [the heroin] in the other one [Warehouse 2]."

151. Continuing on May 30, 2014, at approximately 9:37 p.m. (Session #4436896), VEGA, using Target Device 4, had a BBM conversation with courier BETANCOURT, who was using BBM PIN 334DDF1A.[53] In that conversation, VEGA stated, "Make arrangements with Alex [FIGUEROA] tomorrow at 7 [7:00 a.m.], okay?

152. On June 1, 2014, based on location information for telephone number (630) 962-8364, which is the telephone number associated with BBM PIN 334DF84F, used by FLORES-SANTOS, at approximately 10:05 a.m., LEOs observed a passenger bus bearing the name "Volcano" pull into the bay of Warehouse 2.

153. Continuing on June 1, 2014, at approximately 11:20 a.m. (Session #4437820), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, FLORES-SANTOS stated, "I'm on my way to two [Warehouse 2] already." VEGA replied, "Okay, cool." FLORES-SANTOS asked, "Hey, the one [the bus] at two [Warehouse 2] is bringing nephews [heroin]. Is that what you told me."

---

[53] The identification of BETANCOURT as the user of BBM PIN 334DDF1A is based on the following: On May 9, 2014, at approximately 2:53 p.m., LEOs observed BETANCOURT holding what appeared to be a cellular device in his hands and typing on the device. Pen register data for Target Device 4, used by VEGA, showed that on that same date and time, Target Device 4 received an incoming BBM message from BBM PIN 334DDF1A. On September 26, 2014, LEOs conducted a traffic stop of BETANCOURT, who was identified by his Wisconsin driver's license. Location information for telephone number (331) 999-4486, which is associated with BBM PIN 334DDF1A, showed that the telephone was in the area of the vehicle that BETANCOURT was driving during the traffic stop.

154.    Continuing on June 1, 2014, at approximately 12:00 p.m. (Session #4437850), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.  In that conversation, VEGA stated, "Yes, it [the bus at Warehouse 2] does have [have heroin].   Unload them [the heroin]."  FLORES-SANTOS replied, "Okay."

155.    Continuing on June 1, 2014, at approximately 12:43 p.m. (Session #4437900), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.   In that conversation, FLORES-SANTOS stated, "Look at how they sent it, open like that and white [packages containing heroin were open].  Say something to them."  VEGA responded, "That's how it came out, fuck, let me check."

156.    Continuing on June 1, 2014, at approximately 12:43 p.m. (Session #4437905), VEGA, using Target Device 4, received a BBM message from FLORES-SANTOS, who was using BBM PIN 334DF84F.  The message was a photograph of a long, rectangular, brick-shaped object wrapped in black plastic with half of the wrapping peeled off.  Underneath the peeled off portion of the plastic was a hard-packed, white-colored substance in a clear vacuum-sealed bag.   Based on my training and experience, the shape and packaging of this object is consistent with narcotics packaging.  In addition, as described further below in paragraph 203, the object in this BBM message was consistent with the bricks of heroin seized by LEOs on June 7, 2014.

157.    On June 1, 2014, at approximately 12:55 p.m. (Session #4437944), VEGA, using Target Device 4, had a BBM conversation with one of his narcotics suppliers, FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. VEGA stated, "Buddy, tell whoever arranges them [the individuals who packed the heroin] to pay attention to the work because some came out almost nude [some of the heroin came out of the packages]." STAR replied, "Alright, I'll tell them."

158.    On June 1, 2014, at approximately 1:50 p.m., LEOs observed a white Dodge truck bearing Illinois license 78205X drive through the parking lot of Warehouse 2.[54]

159.    At approximately 2:01 p.m. (Session #4438050), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. VEGA stated, "I passed over there [Warehouse 2] and I didn't see anyone outside the warehouse." Based on the intercepted BBM communications described above in paragraph 154-158 and the surveillance of the Dodge truck at Warehouse 2, I believe that VEGA was conducting counter surveillance for FLORES-SANTOS as FLORES-SANTOS unloaded the heroin from the passenger bus at Warehouse 2.

160.    Continuing on June 1, 2014, at approximately 3:49 p.m. (Session #4438300), VEGA, using Target Device 4, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, VEGA asked, "Where are you going?" FLORES-SANTOS replied, "To eat and then

---

[54] According to Illinois Secretary of State records, the Dodge truck is registered to Individual J, 1201 Superior Street, Aurora, Illinois.

to the house. There were 26 [twenty-six kilograms of heroin that was unloaded from the bus at Warehouse 2]. VEGA asked, "Did you bring Alex [FIGUEROA]?" FLORES-SANTOS replied, "I came to drop Alex off." VEGA stated, "Okay."

161. Based on the above-described BBM communications and physical surveillance of the buses at Warehouse 1 and Warehouse 2, I believe that VEGA instructed FLORES-SANTOS and FIGUEROA to unload the heroin from a commercial passenger bus that arrived at Warehouse 2 on June 1, 2014. VEGA also asked FNU LNU, a/k/a "STAR," for the telephone number of the individual who was supposed to pick up the heroin. Furthermore, while unloading the heroin, FLORES-SANTOS complained to VEGA that the heroin concealed on the bus at Warehouse 2 was packaged poorly. FLORES-SANTOS also confirmed that there were twenty-six kilograms of heroin that he and FIGUEROA unloaded from the bus at Warehouse 2.

### H. On June 3, 2014, VEGA Directed FIGUEROA and BETANCOURT To Pick Up $600,000 in Narcotics Proceeds From Courier RODRIGUEZ.

162. On June 2, 2014, at approximately 5:10 p.m. (Session #4441885), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, STAR stated, "Buddy, I'm going to give you a number so you can pick up some money." VEGA replied, "Okay." STAR stated, "It's going to be 600 [$600,000 of narcotics proceeds]. Do you want the whole thing or half? They can give it in two parts." VEGA responded, "In two parts [two deliveries of $300,000 each] will be fine." In another intercepted BBM communication with VEGA (Session #4441909), at approximately

5:16 p.m., STAR stated, "Okay, here is the number 3 1 2 9 3 1 7 7 2 9, ask for the saint." VEGA replied, "Okay."

163. On June 3, 2014, at approximately 10:40 a.m. (Session #4444077), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using BBM PIN 333E56DF ("Target Device 7").[55] In that conversation, VEGA stated, "3 1 2 9 3 1 7 7 2 9 for the saint [individual who was to deliver the narcotics proceeds]."

*The First June 4, 2014, Pickup of $300,000 in Narcotics Proceeds*

164. Pole camera surveillance footage of 641 Grand Avenue, Aurora, Illinois showed that on June 4, 2014, at approximately 9:21 a.m., FIGUEROA left his residence at 641 Grand Avenue driving a black Ford Edge bearing Illinois license V333147 (the "Ford Edge").[56] Approximately one hour later, LEOs observed the Ford Edge parked in front Salude Bienstar at 1691 Town Center, Suite 105, Aurora, Illinois. At approximately 10:37 a.m., at Warehouse 1, LEOs observed the Chrysler Pacifica parked outside the warehouse. LEOs further observed BETANCOURT and FIGUEROA enter the Chrysler Pacifica and drive to an alley between N. Harding Ave. and N. Springfield Ave. in Chicago, Illinois. At that location, LEOs observed

---

[55] The identification of FIGUEROA as the user of Target Device 7 is based on the following: (a) the use of the same Blackberry screen name of "Maddog" for Target Device 7 and other Blackberry devices previously identified as being used by FIGUEROA through court-authorized interceptions of Target Device 1, Target Device 2, Target Device 3; and (b) location information for Target Device 7 showed that the telephone was at Warehouse 1 on June 4, 2014, where LEOs observed FIGUEROA pick up the Chrysler Pacifica.

[56] According to Illinois Secretary of State records, this vehicle is registered to Individual H, 641 Grand Avenue, Aurora, Illinois.

RODRIGUEZ,[57] carrying a large bag, exit a black Volkswagen sports utility vehicle ("the Volkswagen SUV") and approach the rear of the Chrysler Pacifica. LEOs further observed FIGUEROA open the rear hatchback door of the Chrysler Pacifica and the rear floorboard of the vehicle rise up. RODRIGUEZ then placed a bag inside the floorboard area and returned to the Volkswagen SUV. LEOs subsequently observed RODRIGUEZ drive the Volkswagen SUV at a high rate of speed away from the alley, and change lanes in an erratic manner.

165. On June 4, 2014, at approximately 12:21 p.m. (Session #4448220), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. In that conversation, VEGA asked, "How is it going?" FIGUEROA replied, "Fine. They [RODRIGUEZ] are on their way back now." VEGA asked, "How much did they give you?" FIGUEROA replied, "300 [$300,000]." VEGA stated, "Let me know when you arrive." FIGUEROA responded, "Okay."

166. Based on the intercepted BBM communications described above, I believe that STAR instructed VEGA to pick up $600,000 of narcotics proceeds on STAR's behalf. VEGA indicated that he wanted to pick up the money in two separate deliveries. VEGA then instructed FIGUEROA to contact an individual called "the saint," to arrange for the money pickup. Based on the intercepted BBM communications and surveillance, I believe that FIGUEROA and BETANCOURT picked up the Chrysler Pacifica at Warehouse 1 and traveled to another location to meet RODRIGUEZ. RODRIGUEZ then placed a bag in a hidden compartment of

---

[57] As described further below in paragraph 203, JUAN RODRIGUEZ was identified during a traffic stop of RODRIGUEZ's vehicle on June 7, 2014.

the Chrysler Pacifica. FIGUEROA later confirmed with VEGA that he and BETANCOURT picked up $300,000 in narcotics proceeds. As described below in paragraphs 202-203, the Volkswagen SUV that Rodriguez used to deliver the narcotics proceeds was the same vehicle RODRIGUEZ picked up from FIGUEROA on June 7, 2014 and in which LEOs found approximately 25 kilograms of heroin.

*The Second June 4, 2014, Pick Up of $300,000 in Narcotics Proceeds*

167. On June 4, 2014, at approximately 12:21 p.m. (Session #4448221), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. During that conversation, VEGA asked, "Around what time will you be ready so I can send my brother [FIGUEROA] over there? My guys are already coming. They [FIGUEROA and BETANCOURT] already picked up 300 [$300,000]." STAR later replied, "Okay, they are going to give 300 [$300,000] more. VEGA asked, "Okay, should they [FIGUEROA and BETANCOURT] go right away?" STAR responded, "Yes."

168. On June 4, 2014, at approximately 12:25 p.m. (Session #4448222), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, VEGA stated, "Look, those guys are coming now. Go so the tickets [narcotics proceeds] can be counted."

169. Continuing on June 4, 2014, at approximately 1:30 p.m. (Session 4448534), VEGA, who was using Target Device 4, had a BBM conversation with BETANCOURT, who was using BBM PIN 334DDF1A. In that conversation, BETANCOURT stated, "Ready. We'll be at the warehouse in 20 minutes."

170. On June 4, 2014, at approximately 2:04 p.m., LEOs observed the Chrysler Pacifica arrive at Warehouse 1. Shortly thereafter, LEOs observed BETANCOURT driving the Chrysler Pacifica, with FIGUEROA as the passenger, leave Warehouse 1 and travel again to the alley between N. Harding Ave. and N. Springfield Ave. in Chicago, Illinois. At that location, at approximately 4:16 p.m., LEOs observed the Volkswagen SUV arrive. LEOs further observed RODRIGUEZ exit the Volkswagen SUV and remove a large bag from the vehicle. FIGUEROA then exited the Chrysler Pacifica and opened the vehicle's rear hatchback door. RODRIGUEZ then placed a bag in the rear floor area of the Chrysler Pacifica.

171. On June 4, 2014, at approximately 5:32 p.m. (Session #4449383), VEGA, using Target Device 4, had a BBM conversation with BETANCOURT, who was using BBM PIN 334DDF1A. In that conversation, BETANCOURT asked, "Aye, where should we take these tickets [narcotics proceeds] to the warehouse or somewhere else?" VEGA responded, "To the warehouse so they [narcotics proceeds] can be made ready tomorrow."

172. On June 4, 2014, at approximately 8:38 p.m. (Session #4450574), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, VEGA stated, "We already picked up the 600 [$600,000 of narcotics proceeds]. We'll get them ready tomorrow, cousin, and intend to deliver so that they [the 26 kilograms of heroin that arrived on a bus at Warehouse 1 on June 1, 2014] don't accumulate on us." STAR responded, "Okay, thank you."

173. Based on the above-described intercepted BBM communications and physical surveillance of FIGUEROA, BETANCOURT, and RODRIGUEZ on June 4, 2014, I believe that FIGUEROA and BETANCOURT picked up another $300,000 in narcotics proceeds from RODRIGUEZ on the afternoon of June 4, 2014. After the pickup, VEGA indicated to STAR that he intended to deliver the twenty-six kilograms of heroin he received on June 1, 2014.

**I. June 5, 2014 and June 6, 2014, Intercepted Communications Between the VEGA DTO's Members Regarding the Delivery of 26 Kilograms of Heroin that the VEGA DTO Received on June 1, 2014 at Warehouse 2.**

174. On June 5, 2014, at approximately 9:33 a.m. (Session #4451407), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, FLORES-SANTOS asked, "Hey are we going to deliver the work [heroin]? The one [bus carrying the heroin] for tomorrow is coming and it will be put it away." VEGA replied, "Let me see, I'm checking, I'm going there now."

175. On June 5, 2014, at approximately 10:14 a.m. (Session #4451512), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. During that conversation, VEGA asked, "Cousin, can you call the guys so we can deliver the flower vases [twenty-six kilograms of heroin received on June 1, 2014] so they [the heroin] won't accumulate on us?"

176. Continuing on June 5, 2014, at approximately 11:57 a.m. (Session #4451782), VEGA, using Target Device 4, had a BBM conversation with FNU LNU,

a/k/a "STAR," who was using BBM PIN 2824C71E. During this conversation, STAR asked, "How many flower vases [heroin]." VEGA responded, "There are 26 [twenty-six kilograms of heroin from June 1, 2014]."

177. On June 5, 2014, at approximately 5:39 p.m. (Session #4453077), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1. Based on the intercepted BBM communications described below, I believe that FRANKLIN, on behalf of VEGA's narcotics sources in Mexico, alerted members of the VEGA DTO in the Chicago area as to when the passenger buses containing narcotics would arrive at Warehouse 1 or Warehouse 2. In that conversation, FRANKLIN stated, "The lady [the passenger bus] is arriving tomorrow from 9:00 to 10:00 in the morning."

178. Continuing on June 5, 2014, at approximately 5:40 p.m. (Session #4453141), VEGA, using Target Device 4, had another BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1. VEGA stated, "Okay. Is she [the passenger bus] bringing the kids [heroin]?" FRANKLIN replied, "Yes." VEGA asked, "Okay, and what time does the other [other bus] arrive?" FRANKLIN responded, "From 7:00 to 8:00 in the morning." VEGA stated, "Okay, alright."

179. On June 5, 2014, at approximately 8:40 p.m. (Session #4454283), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. VEGA stated, "Cousin, the aunt [the passenger bus containing heroin] will arrive tomorrow. Give me the number

[telephone number of individual who is to receive the heroin] so we can make the delivery so they [the heroin] won't accumulate on us."

180.    Based on the above-described intercepted BBM communications, I believe that the VEGA DTO still had twenty-six kilograms of heroin that arrived at Warehouse 2 on June 1, 2014.   FRANKLIN informed VEGA that additional heroin would be arriving in a passenger bus on June 6, 2014.   VEGA was concerned about the heroin accumulating on him so he asked STAR for the contact information for the individuals to whom VEGA's couriers should deliver the twenty-six kilograms of heroin that the DTO received on June 1, 2014.

**J.    On June 6, 2014, VEGA Instructed His Couriers FIGUEROA, FLORES-SANTOS, and BETANCOURT to Unload Narcotics From the Passenger Bus at Warehouse 2.**

181.    On June 6, 2014, at approximately 6:21 a.m. (Session #4455124), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. VEGA stated, "From 7:00 to 8:00, okay, to the 1 [Warehouse 1]."  I forgot."

182.    On June 6, 2014, at approximately 6:22 a.m. (Session #4455125), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. VEGA stated, "Between 9:00 and 10:00 the 2 [Warehouse 2], okay?"  FIGUEROA replied, "Okay."

183.    Continuing on June 6, 2014, at approximately 6:24 a.m. (Session #4455139), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7.   VEGA stated, "Alex, go to 1

[Warehouse 1], Willi [FLORES-SANTOS] is not answering. It [the bus] arrives between 7:00 and 8:00." FIGUEROA replied, "Okay." VEGA asked, "Did you already talk to Diego [BETANCOURT]?"[58] FIGUEROA replied, "In a little bit." VEGA later stated, "Go to 1 [Warehouse 1]." FIGUEROA replied, "Okay."

184. On June 6, 2014, at approximately 8:23 a.m. (Session #4455210), VEGA, using Target Device 4, had a BBM conversation with BETANCOURT, who was using BBM PIN 334DDF1A. In that conversation, VEGA stated, "What the fuck, what time are you guys arriving?" BETANCOURT replied, "We're already here [Warehouse 2]." VEGA stated, "Alex already went to the other one [Warehouse 1]. BETANCOURT replied, "Okay."

185. On June 6, 2014, at approximately 8:38 a.m. (Session #4455227), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1. VEGA stated, "Hey, tell the cousin to give me the # so I can deliver [deliver the heroin]. We still have last week's [the heroin that arrived on June 1, 2014], they're going to pile up." FRANKLIN replied, "Okay."

186. On June 6, 2014, at approximately 9:08 a.m. (Session #4455280), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. VEGA asked, "Did you already leave?" FLORES-SANTOS replied, "I'm storing away the other gifts [heroin] because if they come to wash [wash the bus at Warehouse 2], they are going to want to put in water

---

[58] The Blackberry screen name that BETANCOURT used for BBM PIN 334DDF1A was "Diego Verdaguer."

there because I told them that is where you throw it. But its set already, I'm leaving. This thing [the bus] needs a tire." Later in the conversation, VEGA stated, "Stop by the tire shop to see if they open tomorrow." VEGA further stated, "Do a good job of putting the gifts [heroin] away." FLORES-SANTOS replied, "We put them in the white car, just in the meantime while they wash the car [the bus at Warehouse 2]. Later on we'll put them [the heroin] inside. Tomorrow, we'll take them out again."

187.   On June 6, 2014, at 9:20 a.m. (Session #4455281), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. VEGA stated, "Buddy, send me the number to deliver the ones for today [heroin that arrived at Warehouse 2 on June 6, 2014]."

188.   On June 6, 2014, at approximately 9:41 a.m., LEOs observed a passenger bus bearing the name "Volcano" enter the parking area of Warehouse 2.

189.   Continuing on June 6, 2014, at approximately 10:57 a.m. (Session #4455499), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, FLORES-SANTOS stated, 'Hey, there are several people in the warehouse next door. I'm going to wait a while, okay? Because everything one says can be heard." VEGA replied, "Okay, have them start cleaning it [the bus at Warehouse 2]."

190.   Based on the above-described intercepted BBM communications and physical surveillance of a passenger bus arriving at Warehouse 2, I believe that FNU LNU, a/k/a "FRANKLIN," informed VEGA that on June 6, 2014, a bus was

going to arrive at Warehouse 1 and another bus containing heroin was going to arrive at Warehouse 2. VEGA was concerned that there would be too much heroin stored at the warehouses so VEGA contacted FNU LNU, a/k/a "STAR," and asked for the telephone number of the individual who was to receive the twenty-six kilograms of heroin that the VEGA DTO received on June 1, 2014. VEGA then instructed FIGUEROA to go to Warehouse 1. FLORES-SANTOS and BETANCOURT went to Warehouse 2 where they started to unload the heroin off the bus. FLORES-SANTOS then informed VEGA that he was going to wait before unloading the heroin because he was concerned that the people in the next warehouse may hear what he was doing.

### K. Between June 6, 2014 and June 7, 2014, VEGA Directed FIGUEROA and FLORES-SANTOS to Deliver the Heroin Received by the VEGA DTO on June 1, 2014 and June 6, 2014 to Various Narcotics Customers.

*VEGA Arranged the Delivery of the 26 Kilograms of Heroin Received by the VEGA DTO on June 1, 2014 to the Couriers "Diego" and "Botas."*

191. On June 6, 2014, at approximately 11:21 a.m. (Session #4455588), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, STAR stated, "Here goes the number, it is 8 7 2 2 2 3 2 2 8 6. Ask for Diego. Give them the 20 flower vases [20 kilograms of heroin that the VEGA DTO received on June 1, 2014]." VEGA asked, "The ones from today [heroin that arrived at Warehouse 2 on June 6, 2014]?"

192.    Continuing on June 6, 2014, at approximately 11:41 a.m. (Session #4455627), VEGA, using Target Device 4, had another BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E.   In that conversation, STAR stated, "Oh, give them [Diego] 20 [twenty kilograms of heroin received by the VEGA DTO on June 1, 2014] and 6 to another number [the remaining six kilograms of heroin received that day to another individual]." VEGA replied, "Okay." STAR stated, "You want me to give it [the telephone number] to you while I'm at it?" VEGA replied, "Should I deliver the 20 [twenty kilograms of heroin to Diego] first? Yes." STAR responded, "Yes." VEGA asked, "But, call the other one." STAR replied, "Okay, for the guy for the 6 [six kilograms of heroin], it's 6 3 0 9 1 5 0 3 2 2. Ask for *botas* [the individual who was to receive the heroin]." VEGA responded, "Okay, sounds good."

193.    On June 6, 2014, at approximately 11:48 a.m. (Session #4455628), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7.  In that conversation, VEGA stated, "8 7 2 2 2 3 2 2 8 6.  Ask for Diego, give him 20 [twenty out of the twenty-six kilograms of heroin that the VEGA DTO received on June 1, 2014]."

> *VEGA Arranged the Delivery of the 20 Kilograms of Heroin*
> *Received by the VEGA DTO on June 6, 2014 to Courier "Primo."*

194.    On June 6, 2014, at approximately 4:23 p.m. (Session #4456569), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E.  STAR stated, "Give 20 [twenty kilograms of heroin] to the first number, to Diego, of what you have stored away [of

the heroin that the VEGA DTO received on June 1, 2014] and give 6 [six kilograms of heroin] to the other, to *botas*, of the stored ones [from the remaining heroin that the VEGA DTO received on June 1, 2014]." VEGA replied, "We haven't unloaded todays [the heroin that arrived on the bus at Warehouse 2 on June 6, 2014]. The other guy called me on behalf of *primo* [the individual who was to receive the heroin that the VEGA DTO received on June 1, 2014]. The guy [*primo*] we were going to give the ones I have stored away to [the heroin received on June 1, 2014]?" STAR responded, "The other one [the heroin that the VEGA DTO received on June 6, 2014] tomorrow [needs to be delivered tomorrow]." VEGA stated, "The 26 [twenty-six kilograms of heroin] from last week [received by the VEGA DTO on June 1, 2014]. They [the individuals who were to receive that heroin] are saying they can come now. The one that arrived today [heroin received on June 6, 2014] I am going to unload in the morning. Oh, okay, that's fine. So then, the one [heroin] we are going to unload I'll store these away." STAR replied, "I will give you another # [telephone number of the individual who is to receive the heroin that the VEGA DTO received on June 6, 2014] and you can arrange it with him." VEGA stated, "Okay." STAR responded, "2 1 7 8 4 8 4 3 6 5 on behalf of *primo* for the 20 [twenty kilograms that arrived at Warehouse 2 on June 6, 2014]."

195. Based on the above-described intercepted BBM communications, I believe that STAR instructed VEGA to deliver twenty of the twenty-six kilograms of heroin that the VEGA DTO received on June 1, 2014 to an individual called "Diego," and the remaining six kilograms of heroin to an individual called "*botas.*" VEGA

82

then instructed FIGUEROA to deliver the narcotics to "Diego." STAR further instructed VEGA to deliver the twenty kilograms that the VEGA DTO received on June 6, 2014 to "*primo*."

> *June 7, 2014, Intercepted Communications Between VEGA, FIGUEROA and FLORES-SANTOS Regarding the Delivery of 20 Kilograms of Heroin to "Diego."*

196.  On June 6, 2014, at approximately 4:33 p.m. (Session #4456803), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.  VEGA stated, "The one I just gave to Alex [FIGUEROA] is for 20 [twenty kilograms of heroin to be delivered to Diego]." FLORES-SANTOS replied, "Yes, he [FIGUEROA] arranged for tomorrow [arranged the delivery of heroin for tomorrow]."  VEGA stated, "It's 3 deliveries, we'll deliver everything tomorrow."  VEGA further stated, "They're new numbers [telephone numbers], nothing from last week.  I have 3 numbers so I can turn in all of them." FLORES-SANTOS replied, "Okay."  VEGA stated, "The one [telephone number] I gave Alex [FIGUEROA], which is from Diego, and 2 [two other telephone numbers] that I have.  Okay?"  FLORES-SANTOS replied, "Okay."  VEGA stated, "I'll give you the numbers here at the game, for early tomorrow."

197.  On June 7, 2014, at approximately 11:02 a.m. (Session #4459356), FIGUEROA, using Target Device 7, had a BBM conversation with VEGA, who was using Target Device 4.  FIGUEROA asked, "What are they going to do with the 6 [six out of the twenty-six kilograms that the VEGA DTO received on June 1, 2014]?" VEGA replied, "Store them [the heroin].  First hand over [deliver] the 20 [twenty

out of the twenty kilograms that the VEGA DTO received on June 1, 2014] and 20 [twenty kilograms of heroin that the VEGA DTO received on June 6, 2014]."

198.    Continuing on June 7, 2014, at approximately 11:44 a.m. (Session #4459455), FIGUEROA, using Target Device 7, had another BBM conversation with VEGA, who was using Target Device 4. VEGA asked, "Who went for you? Did you hand over the truck?" FIGUEROA replied, "No. Yeah I have some." VEGA later stated, "Don't give it to him [Diego] in the same spot okay?" FIGUEROA asked, "Don't what?" VEGA responded, "Give it [the twenty kilograms of heroin] to him [Diego] somewhere else. Not the same spot okay."

199.    Continuing on June 7, 2014, at approximately 12:28 p.m., FIGUEROA, using Target Device 7, had another BBM conversation with VEGA, who was using Target Device 4. FIGUEROA stated, "Okay, finished with the first one [delivery of twenty kilograms of heroin to Diego]." VEGA asked, "Where are you? I'll come by for you." FIGUEROA replied, "I am with Diego [BETANCOURT]." VEGA stated, "Oh, okay, fine."

200.    Based on the above-described intercepted BBM communications, I believe that VEGA instructed FIGUEROA to deliver twenty kilograms of heroin that the VEGA DTO received on June 1, 2014 to "Diego." VEGA also indicated to FLORES-SANTOS that he would give FLORES-SANTOS the telephone numbers of the other individuals who were to receive additional amounts of heroin. FIGUEROA later confirmed with VEGA that he delivered the twenty kilograms of heroin to "Diego."

**L.    On June 7, 2014, LEOs Seize Approximately 25 Kilograms of Heroin from RODRIGUEZ Who Received the Heroin from FIGUEROA and BETANCOURT.**

201.    On June 7, 2014, at approximately 6:33 a.m., LEOs observed FIGUEROA leave his residence at 641 Grand Avenue, Aurora, Illinois, driving the Ford Edge.    Approximately half an hour later, LEOs observed FIGUEROA and BETANCOURT exit a silver Acura at Warehouse 2.    At approximately 9:48 a.m., FIGUEROA drove a silver Acura to Warehouse 1.    A few minutes later, BETANCOURT, driving the Chrysler Pacifica, left Warehouse 1.

202.    At approximately 11:33 a.m., LEOs observed BETANCOURT arrive at Warehouse 1.    Approximately ten minutes later, FIGUEROA, who was driving the same Volkswagen SUV that RODRIGUEZ drove to deliver narcotics proceeds to FIGUEROA on June 4, 2014 (see paragraphs 164 and 170 above), entered Warehouse 1.    At that same time, LEOs also observed VEGA, who was driving a white van, drive slowly past Warehouse 1.    VEGA continued to circle the area in the van.    Based on my training and experience, the experience of other LEOs, and the physical surveillance of VEGA, I believe that VEGA was looking out for law enforcement's presence.    At approximately 12:08 p.m., LEOs observed the Volkswagen SUV leave Warehouse 1 and travel to a parking lot of the Westgate shopping center in Aurora, Illinois.    At approximately 12:22 p.m., RODRIGUEZ exited a store at the shopping center and met FIGUEROA by the Volkswagen SUV in the parking lot.    RODRIGUEZ then entered the driver's seat of the Volkswagen SUV, FIGUEROA entered the front passenger seat, and the vehicle traveled to a nearby Walmart in Aurora, Illinois.    At approximately 12:24 p.m., FIGUEROA

exited the Volkswagen SUV and entered the Walmart. RODRIGUEZ then drove the Volkswagen SUV park in the parking lot of the Walmart. At approximately 12:32 p.m., LEOs observed FIGUEROA and BETANCOURT exit the Walmart, enter the silver Acura, and leave the area. Shortly thereafter, the Volkswagen SUV, driven by RODRIGUEZ, also left the area.

203. At approximately 1:03 p.m., LEOs conducted a traffic stop on the Volkswagen SUV because RODRIGUEZ was using a cellular telephone while driving. After RODRIGUEZ consented to a search of the vehicle, LEOs recovered approximately twenty, brick-shaped packages weighing approximately twenty-five kilograms and containing a tan powdery substance wrapped in black tape and green plastic wrap.[59] The substance field-tested positive for heroin. These packages were found in a hidden compartment underneath the driver and front passenger seats of the vehicle. The shape and packaging of the heroin was consistent with the objects depicted in a BBM message sent by FLORES-SANTOS to VEGA on June 1, 2014 (see paragraph 156 above). LEOs also recovered approximately sixty-three grams of a white powdery substance that was concealed in a vitamin bottle, which was located in a hidden compartment underneath the front passenger seat of the vehicle. The substance field-tested positive for cocaine. RODRIGUEZ told LEOs that he had "a little K-2 inside the door."[60] Inside the front driver's side door

---

[59] Twenty-five kilograms is the gross weight including the packaging.

[60] RODRIGUEZ made no other statements about the heroin and cocaine found in his vehicle.

compartment, LEOs recovered two separate baggies containing synthetic cannabis that weighed a total of approximately 36.5 grams.

**M. On June 7, 2014, at VEGA's Direction, FIGUEROA and BETANCOURT Delivered Eleven of the Twenty Kilograms of Heroin that the VEGA DTO Received on June 6, 2014 to "*Primo*" and Six Kilograms of Heroin that the VEGA DTO Received on June 1, 2014 to "*Botas.*"**

204. On June 7, 2014, at approximately 1:12 p.m. (Session #4459705), VEGA, using Target Device 4, had a BBM conversation with BETANCOURT, who was using BBM PIN 334DDF1A. BETANCOURT asked, "Aye, are the 20 [twenty kilograms of heroin] for this *primo*? VEGA replied, "Yes." VEGA further stated, "In the red truck to the number [telephone number] that I gave Alex [FIGUEROA]." BETANCOURT replied, "Okay, I'll let him know." VEGA asked, "Aren't you with him [FIGUEROA]?" BETANCOURT responded, "Yes."

205. On June 7, 2014, at approximately 1:22 p.m. (Session #4459786), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. FIGUEROA stated, "Okay. They [the twenty kilograms of heroin] don't all fit in the trap." VEGA responded, "Just the ones that fit [deliver the heroin that fits in the hidden compartment]." FIGUEROA replied, "Okay." VEGA asked, "How many fit?" FIGUEROA replied, "11 [eleven kilograms of heroin]." VEGA stated, "Okay."

206. Continuing on June 7, 2014, at approximately 1:45 p.m. (Session #4459883), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. In that conversation, FIGUEROA stated, "Okay, finished with the second [delivery of heroin to *primo*]." VEGA asked,

"Only 11 [eleven kilograms of heroin]?" FIGUEROA replied "Yes." VEGA asked, "Okay, when will he [*primo*] be back?" FIGUEROA stated, "Where? We are eating." VEGA stated, "No, the guy you gave 11 [eleven kilograms of heroin] to, when will he [*primo*] come back for the rest?" FIGUEROA responded, "I don't know. Let me check with Diego [BETANCOURT]." VEGA stated, "Okay, I am on my way there so the tires [tires to the bus] can be put on." FIGUEROA replied, "Okay." VEGA then stated, "6 3 0 9 1 5 0 3 2 2. Ask for *votas*,[61] see if he can come. There are 6 [six kilograms of heroin] for him."

207. Continuing on June 7, 2014, at approximately 2:04 p.m. (Session #4459937), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. FIGUEROA stated, "They [*primo*] said tomorrow at 11:00." VEGA replied, "Okay. Good. I'll wait for you here at the warehouse."

208. On June 7, 2014, at approximately 4:23 p.m. (Session #4460497), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. VEGA stated, "Diego [BETANCOURT] could only fit 11 [eleven kilograms of heroin], he'll [*primo*] come tomorrow for the rest and for *votas* has to be handed over early [the additional six kilograms of heroin will be delivered to the individual called "boots"]."

---

[61] VEGA wrote "votas" in Spanish, but based on the communication described above in paragraph 192 above, VEGA most likely meant to write "botas," which in English means "boots."

209. Based on the above-described intercepted BBM communications, I believe that VEGA initially arranged for FIGUEROA and BETANCOURT to deliver twenty kilograms of heroin that the VEGA DTO received on June 6, 2014 to "*primo*"; however, FIGUEROA informed VEGA that only eleven kilograms of heroin fit in a hidden compartment of a vehicle that was being used by "*primo*" to transport the heroin. Therefore, FIGUEROA and BETANCOURT delivered only eleven kilograms of heroin to "*primo*." VEGA later informed FNU LNU, a/k/a "STAR," that the next day, "*primo*" would pick up the remaining kilograms of heroin and the six kilograms of heroin that the VEGA DTO received on June 1, 2014 would be delivered to "*botas*."

210. On June 8, 2014, at approximately 10:49 a.m. (Session #4463642), FIGUEROA, using Target Device 7, had a BBM conversation with VEGA, who was using Target Device 4. FIGUEROA stated, "The guy is coming for the 6 [six kilograms of heroin] that I told the guy. What are you waiting for?" VEGA asked, "Where is the truck at?" FIGUEROA replied, "In the warehouse." VEGA stated, "Ok give it to them [the individual picking up the six kilograms of heroin]."

211. On June 8, 2014, at approximately 6:53 p.m. (Session #4464696), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. VEGA stated, "Hey man, I delivered to *Votas* and he has not answered to return the truck, check if everything is ok."

212. Continuing on June 9, 2014, at approximately 11:31 a.m. (Session #4465872), VEGA, using Target Device 4, had a BBM conversation with FNU LNU,

a/k/a "STAR," who was using BBM PIN 2824C71E. STAR stated, "*Botas* finally responded, they called him and he said everything is fine."

213. Based on the above-described intercepted BBM communications, I believe that FIGUEROA delivered six out of the twenty-six kilograms that the VEGA DTO received on June 1, 2014 to "*botas*," who FIGUEROA contacted by calling telephone number (630) 915-0322.

**N.    On June 8, 2014, the VEGA DTO Received Twenty-Six Kilograms of Heroin at Warehouse 2 and on June 10, 2014, at VEGA's Direction, FIGUEROA and FLORES-SANTOS Delivered the Heroin to a Courier for a Narcotics Customer.**

214. On June 7, 2014, at approximately 8:55 p.m. (Session #4462612), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "FRANKLIN," who was using BBM PIN 7A6E50D1. In that conversation, FRANKLIN stated, "Between 6 and 7 [6:00 a.m. and 7:00 a.m.] the aunt [bus] arrives with the kids [heroin]."

215. On June 8, 2014, at approximately 10:47 a.m. (Session #4463641), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. FLORES-SANTOS stated, "I am here [at Warehouse 2]." VEGA stated, "Oh, okay, that's fine. Has the aunt [bus] arrived, or not yet?" FLORES-SANTOS responded, "Yes, she just arrived. Cowboy left with the drivers." FLORES-SANTOS later asked, "What do you want me to take out of here [the bus], just the welding machine?" VEGA replied, "I will tell you shortly." FLORES-SANTOS stated, "Okay. So then, I can't go with you?" VEGA replied, "No, not the tools." FLORES-SANTOS asked, "Then, what do I take out if the gifts

[the heroin] are in the aunt's wallet [the bus' hidden compartments]? You said tomorrow morning." VEGA responded, "No, the ones [then heroin] that were left at the 2 [Warehouse 2]." FLORES-SANTOS stated, "There is nothing here [there are no narcotics at Warehouse 2]. They [the heroin] are at 1 [Warehouse 1], but let me ask so that if not then I'll do it." VEGA asked, "Where is the red truck?" FLORES-SANTOS replied, "At 1 [Warehouse 1]. That's where the gifts [the heroin] are." VEGA asked, "You moved them [the heroin]?" FLORES-SANTOS replied, "Yes. They [the heroin] are in the red one [the red truck]."

216. On June 9, 2014, at approximately 1:19 p.m. (Session #4466119), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. In that conversation, VEGA stated, "Yes, got it [the heroin]." STAR asked, "How many flower vases [kilograms of heroin] do you have total?"

217. Continuing on June 9, 2014, at approximately 2:02 p.m. (Session #4466215), VEGA, using Target Device 4, had another BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. VEGA responded, "9 from the 11[62] and 26 [twenty-six kilograms of heroin] arrived today."

218. Continuing on June 9, 2014, at approximately 2:33 p.m. (Session #4466300), VEGA, using Target Device 4, had a BBM conversation with FNU LNU,

[62] Based on the prior BBM conversations of VEGA and STAR, it is believed that in this BBM communication, VEGA meant to say that he had nine out of the twenty kilograms that the VEGA DTO received on June 1, 2014 (not eleven since eleven kilograms were already delivered to "primo"). VEGA also seemed to miscount the amount of heroin he had remaining because as of the time of this BBM conversation, FIGUEROA had already delivered six kilograms to "botas."

a/k/a "STAR," who was using BBM PIN 2824C71E. STAR stated, "Give the 26 [twenty-six kilograms of heroin that the VEGA DTO received on June 8, 2014] to Manuel's helper."

219. On June 9, 2014, at approximately 4:01 p.m. (Session #4466746), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a LOBO al MILLON, who was using BBM PIN 2A10655C.[63] VEGA stated, "Send me the # [telephone number] for delivering the flower vases [twenty-six kilograms of heroin]."

220. Continuing on June 9, 2014, at approximately 4:33 p.m. (Session #4466852), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a LOBO al MILLON, who was using BBM PIN 2A10655C. LOBO al MILLON stated, "8 7 2 3 0 3 4 8 3 9. *El guero.*"

221. On June 9, 2014, at approximately 7:03 p.m. (Session #4467324), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. VEGA asked, "Did you find a tel [telephone]? 8 7 2 3 0 3 4 8 3 9. Ask for *El guero.*"

222. On June 10, 2014, at approximately 11:05 a.m. (Session #4468768), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, FLORES-SANTOS stated, "The gifts [twenty-six kilograms of heroin] have been delivered. Everything is fine."

---

[63] "LOBO al MILLON" is the Blackberry screen name used by the user of BBM PIN 2A10655C.

223. Continuing on June 10, 2014, at approximately 11:06 a.m. (Session #4468769), FIGUEROA, using Target Device 7, had a BBM conversation with VEGA, who was using Target Device 4. FIGUEROA stated, "It's already done." VEGA asked, "Did you hand in [deliver the heroin in] the red truck?" FIGUEROA replied, "Yes."

224. Based on the above-described intercepted BBM communications, I believe that FLORES-SANTOS informed VEGA that a bus containing heroin arrived at one of the warehouses. VEGA then confirmed with FNU LNU, a/k/a "STAR," that the bus contained twenty-six kilograms of heroin. VEGA then reached out to FNU LNU, a/k/a "LOBO AL MILLON," who instructed VEGA to deliver the heroin to "*El guero*." FIGUEROA received the telephone number for "*El guero*" from VEGA and FLORES-SANTOS later confirmed with VEGA that the delivery had been completed.

**O. On June 10, 2014, LEOs Seized Approximately 31 Kilograms of Heroin from Individual C, Who Received the Heroin from FIGUEROA.**

225. On June 10, 2014, at approximately 8:30 a.m., LEOs observed FIGUEROA leave the residence at 641 Grand Avenue, Aurora, Illinois. FIGUEROA entered a white Acura bearing Illinois license V464033[64] and traveled to a business located at 1691 Town Center, #105, Aurora, Illinois (the "Salude Bienstar").[65] LEOs

---

[64] According to Illinois Secretary of State records, the white Acura is registered to ALEXANDER FIGUEROA, 641 Grand Avenue, Aurora, Illinois.

[65] According to lease documents for Salude Bienstar, Individual I (VEGA's wife, see paragraph 270 below), is one of the tenants of the business, which is described on the lease agreement as an "Herbal Life Office."

then observed FLORES-SANTOS and BETANCOURT standing outside Salude Bienstar. Shortly thereafter, LEOs observed FLORES-SANTOS and BETANCOURT enter a silver Acura and leave the area. LEOs also observed FIGUEROA, who was driving a maroon Acura, depart the area. At Warehouse 2, at approximately 10:33 a.m., LEOs observed the bay door of Warehouse 2 open and the Chrysler Pacifica leave the warehouse. Shortly thereafter, LEOs observed the Chrysler Pacifica in a Walmart parking lot at 2900 Kirk Road, Aurora, Illinois. LEOs then observed FIGUEROA exit the Walmart and leave the area in a maroon Acura, which LEOs observed earlier that day at Salude Bienstar. Shortly after FIGUEROA left Walmart, LEOs observed a male individual enter the Chrysler Pacifica and drive the vehicle to a garage at 5340 S. Kedzie, Chicago, Illinois. LEOs approached the driver of the Chrysler Pacifica, Individual C, and pursuant to a consent search, recovered approximately twenty-six, brick-shaped packages containing a tan, powdery substance, which were wrapped in black tape and green plastic wrap. The substance field-tested positive for heroin and weighed approximately 31 kilograms.[66] The packages were found in a hidden compartment in the rear floor area of the Chrysler Pacifica. Based on the intercepted BBM communications described above in paragraphs 214-223 and physical surveillance, I believe that FIGUEROA, at VEGA's direction, loaded the Chrysler Pacifica with heroin that the VEGA DTO received at Warehouse 2 on June 9, 2014 then delivered the vehicle to Individual C.

---

[66] This is gross weight which included the packaging.

**P.**   **VEGA's Intercepted Communications between June 10, 2014 and June 12, 2014 Regarding the Delivery of the Remaining Kilograms of Heroin that the VEGA DTO Received on June 6, 2014.**

226.   As described above in paragraphs 205-208, out of the twenty kilograms of heroin that the VEGA DTO received on June 6, 2014, only eleven kilograms were delivered by FIGUEROA and BETANCOURT to "*primo*." As described below, VEGA instructed FIGUEROA to deliver the seven kilograms of heroin to an individual called "*El Veterano*." VEGA then kept the remaining two kilograms of heroin.

227.   On June 10, 2014, at approximately 12:01 p.m. (Session #4468808), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. During the conversation, STAR stated, "Look, I'm going to give you the number for the flower vases [remaining heroin] once and for all." STAR then stated, "7 7 3 4 9 4 7 3 0 1 with *El Veterano*." VEGA replied, "Okay, alright."

228.   On June 11, 2014, at approximately 10:38 a.m. (Session #4471042), FIGUEROA, using Target Device 7, had a BBM conversation with VEGA, who was using Target Device 4. VEGA stated, "Listen, I'm going to send you the number for the ones [heroin] that are left." VEGA later stated, "7 7 3 4 9 4 7 3 0 1 to give him whatever is left."

229.   Continuing on June 12, 2014, at approximately 11:49 a.m. (Session #4474167), FIGUEROA, using Target Device 7, had a BBM conversation with

VEGA, who was using Target Device 4. FIGUEROA stated, "Okay, finish. They already left with the job [heroin]."

230. Continuing on June 12, 2014, at approximately 12:19 p.m. (Session #4474232), FIGUEROA, using Target Device 7, had a BBM conversation with VEGA, who was using Target Device 4. VEGA asked, "Okay, how many were they?" FIGUEROA replied, "7 [seven kilograms of heroin]."

231. On June 12, 2014, at approximately 8:56 p.m. (Session #4475764), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. During the conversation, STAR stated, "Alright, buddy, they only delivered seven flower vases [seven kilograms of heroin] out of the nine [nine kilograms of heroin remaining from the heroin received by the VEGA DTO on June 6, 2014] that were there."

232. Continuing on June 12, 2014, at approximately 9:09 p.m. (Session #4475768), VEGA, using Target Device 4, had a BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. STAR asked, "Did you keep 2 [two kilograms of heroin]?" VEGA replied, "I grabbed 2 [two kilograms of heroin]. I'll deposit [pay for] them. I have 70 [$70,000]. I'll send them [the money]. STAR stated, "Alright. We'll settle up later." VEGA stated, "Yes. I'll deposit them [the money for the two kilograms of heroin] in the one that's supposed to be deposited into [the bus transporting narcotics proceeds back to Mexico]."

233. Based on the above-described intercepted BBM communications, I believe that VEGA received telephone number (773) 494-7301 from STAR, who

instructed VEGA to deliver to the individual using that telephone number seven out of the twenty kilograms of heroin that the VEGA DTO received on June 6, 2014. VEGA provided telephone number (773) 494-7301 to FIGUEROA, who later confirmed with VEGA that he had delivered the seven kilograms of heroin to that individual. VEGA later indicated to FNU LNU, a/k/a "STAR" that he kept the remaining two kilograms of heroin and would pay STAR $70,000 for the heroin at a later time. [67]

> **Q.** **Between June 16, 2014 and June 18, 2014, at VEGA's Direction, FIGUEROA Picked Up Narcotics Proceeds from Couriers of Narcotics Customers, "*La Torre*" and "*Veterano*."**

234. On June 16, 2014, at approximately 1:07 p.m. (Session #4482422), VEGA, using Target Device 4, had the following BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. STAR stated, "Cousin, I am going to give you a # [telephone number] so you can pick up 125 [$125,000 in narcotics proceeds] and add them to what you got." VEGA replied, "But, would it be for the one [the bus] arriving Friday. Today's [the bus] is leaving already, we already filled [filled the bus with narcotics proceeds]. Send it [the telephone number] to me." STAR stated, "For Friday. I am going to send you another 200 more [an additional $200,000 in narcotics proceeds] of 100 and 100 [two separate pick-ups of $100,000 each]." STAR later stated, "It's 7 7 3 6 4 1 1 2 3 7, to *la torre*. It's 125 [$125,000 in narcotics proceeds] with him."

---

[67] Out of the twenty kilograms of heroin that the VEGA DTO received on June 6, 2014, eleven kilograms were delivered to "*primo*," seven kilograms were delivered to "*Veterano*," and two kilograms were kept by VEGA.

235. On June 16, 2014, at approximately 4:19 p.m. (Session #4482796), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. VEGA stated, "7 7 3 6 4 1 1 2 3 7. *La torre.*" Based on the intercepted BBM communication between VEGA and STAR described above, I believe that VEGA provided FIGUEROA with this telephone number so that FIGUEROA could pick up the narcotics proceeds from the user of that telephone number.

236. On June 16, 2014, at approximately 4:58 p.m. (Session #4482897), VEGA, using Target Device 4, had the following BBM conversation with FNU LNU, a/k/a "STAR," who was using BBM PIN 2824C71E. STAR stated, "Buddy, this is the other one, 7 7 3 4 9 4 7 3 0 1 with *Veterano*, he is going to give 100 [$100,000 in narcotics proceeds]."

237. Continuing on June 17, 2014, at approximately 7:23 p.m. (Session #4484626), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. FIGUEROA asked, "Can you guys give me the guy's number so that I can go pick up tomorrow?" VEGA replied, "7 7 3 4 9 4 7 3 0 1 for *el Veterano*. He's going to give you 100 [$100,000 in narcotics proceeds]." FIGUEROA stated, "Okay."

238. Continuing on June 18, 2014, at approximately 2:31 p.m. (Session #4484807), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. During that conversation, VEGA stated, "Did they only give you 100 [$100,000]?" FIGUEROA replied, "105

[$105,000]." VEGA stated, "Okay, then and how about yesterday?" FIGUEROA replied, "125 [$125,000]."

239. Continuing on June 18, 2014, at approximately 2:57 p.m. (Session #4484810), VEGA, using Target Device 4, had a BBM conversation with STAR, who was using BBM PIN 2824C71E. VEGA stated, "We already picked up, they gave 105 [$105,000], and yesterday 125 [$125,000]."

240. Based on the above-described intercepted BBM communications, I believe that STAR instructed VEGA to pick up narcotics proceeds from two couriers for narcotics customers - "*La torre*," who was using telephone number (773) 641-1237, and "*Veterano*," who was using telephone number (773) 494-7301. VEGA provided these telephone numbers to FIGUEROA, who then picked up $125,000 from "*La torre*" and $105,000 from "*Veterano*."

**R.    July 3, 2014, Traffic Stop of VEGA and FIGUEROA in Texas and VEGA's Subsequent Conversations with Members of the VEGA DTO Regarding Concealing Their Narcotics-Related Activities.**

241. Based on location information for Target Device 4, used by VEGA, LEOs determined that VEGA left Illinois on or about July 2, 2014, and headed toward the U.S-Mexico border. On July 3, 2014, LEOs learned that on that same day, VEGA and FIGUEROA were stopped by law enforcement officers in Webb County, Texas ("Webb County LEOs"), for traffic-related offenses.[68] Webb County LEOs subsequently found a total of approximately $21,000 in cash on VEGA and FIGUEROA. Some of the money was concealed in the waist area of the pants worn

---

[68] VEGA and FIGUEROA were identified by their Illinois driver's licenses.

by VEGA and FIGUEROA. VEGA and FIGUEROA were released and no charges were filed against them.

242. On July 3, 2014, at approximately 8:17 p.m. (Session #4540342), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, FLORES-SANTOS asked, "Hey, where are you?" VEGA responded, "You know what? Move the truck [truck used to transport narcotics and narcotics proceeds] to Fredi's. Put it away. We got fucked over here." FLORES-SANTOS replied, "Right now? There is nowhere to park it there. The garage is full of things. Where are you? Aye?"

243. Continuing on July 3, 2014, at approximately 8:26 p.m. (Session #4540399), VEGA, using Target Device 4, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, VEGA stated, "On the street. Can you or should I send someone?" FLORES-SANTOS replied, "But, if I take it [the truck] right now they [law enforcement] are going to see where I take it." VEGA responded, "No. There is no problem yet. Take it out." FLORES-SANTOS stated, "Let me ask Fre to help me but the paper [narcotics proceeds] has to be taken out [out of the truck]. So then, should we not go there [the warehouse] anymore or what am I going to do?" VEGA replied, "Okay. Just cleaning [clean the vehicles at the warehouse]." FLORES-SANTOS stated, "Okay. The aunts [buses carrying narcotics] are only going to be cleaned because if I go by they [law enforcement] are going to arrive, you can count on that."

244.    Continuing on July 3, 2014, at approximately 9:59 p.m. (Session #4540700), VEGA, using Target Device 4, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.    In that conversation, VEGA stated, "Here at the border [the U.S.-Mexico border] without money.    They [law enforcement] took it all from me."    FLORES-SANTOS replied, "So then you were the one they [law enforcement] fucked over.    I thought it was the aunt [bus carrying narcotics].    I already took out the ... brown truck.    I have it put away already."    VEGA stated, "That's right, me and Alex."

245.    Continuing on July 3, 2014, at approximately 10:16 p.m. (Session #4540806), VEGA, using Target Device 4, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F.    FLORES-SANTOS asked, "How much did they take from you?"    VEGA replied, "All of it, 21000 [$21,000]."    FLORES-SANTOS replied, "Fudge, man but you knew."    VEGA stated, "But, the problem is coming from over there [LEOs investigating his activities in Chicago] not because of the money.    Be careful."    FLORES-SANTOS replied, "Okay, what did they [law enforcement] say to you?    But, you already know they are investigating you?"    VEGA stated, "The problem is that the DEA has them.    Yes.    That's exactly it."    FLORES-SANTOS asked, "So then, nothing can be done anymore?"    VEGA responded, "You guys can."    FLORES-SANTOS further asked, "Did they [law enforcement] say anything to you about us?    But, the good thing is they let you go."    VEGA replied, "Nothing."    FLORES-SANTOS stated, "Okay.    And, what did they say to Alex [FIGUEROA].    Is he alright?"    VEGA replied, "No."    FLORES-SANTOS

further stated, "So then, not you or Alex can work [engage in narcotics trafficking activities] anymore?"

246. Continuing on July 3, 2014, at approximately 10:40 p.m. (Session #4540808), VEGA, using Target Device 4, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. In that conversation, VEGA stated, "No [VEGA and FIGUEROA will discontinue their narcotics trafficking activities for the time being]." FLORES-SANTOS replied, "Then it's going to be tough." VEGA stated, "Yes, honestly, yes. Where are you?" FLORES-SANTOS responded, "At the house." VEGA stated, "Oh, okay."

247. Continuing on July 3, 2014, at approximately 10:52 p.m. (Session #4540916), VEGA, using Target Device 4, had another BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. VEGA stated, "Send me Alex's ping [FIGUEROA's BBM PIN]." FLORES-SANTOS stated, "Okay. Isn't he [FIGUEROA] with you? Or, did he [FIGUEROA] already come back [to Chicago]?" VEGA replied, "Yeah, but [Individual H] has the ping."[69] FLORES-SANTOS stated, "Okay. 333E56DF [Target Device 7]." FLORES-SANTOS then asked, "Okay, so then what am I going to do because they [law enforcement] are going to be checking on me too?" VEGA replied, "Nothing. Just clean [unload narcotics from] the bus [bus carrying narcotics], that's all."

---

[69] Location information for Target Device 7 showed that on July 3, 2014, the same day FIGUEROA was in Texas, Target Device 7 was in the vicinity of 641 Grand Avenue, Aurora, Illinois, which is the registered residence for FIGUEROA and his wife, Individual H. Based on this telephone location information and the conversations described below in paragraphs 249-252, LEOs believe that the user of Target Device 7 in these conversations was Individual H, not FIGUEROA.

248.     Based on the above-described intercepted BBM communications and information obtained from LEOs in Webb County, Texas regarding the July 3, 2014, traffic stop of VEGA and FIGUEROA, I believe that VEGA informed FLORES-SANTOS about the traffic stop on FIGUEROA's vehicle in Texas and the seizure of the $21,000 in cash from VEGA and FIGUEROA.  VEGA suspected that DEA was investigating members of the VEGA DTO and instructed FLORES-SANTOS to move the vehicles the VEGA DTO used to transport narcotics and narcotics proceeds from Warehouse 1 and Warehouse 2.  VEGA also instructed FLORES-SANTOS to remove any narcotics and narcotics proceeds left on the bus so that law enforcement will not find them.  VEGA indicated to FLORES-SANTOS that he and FIGUEROA were going to cease their narcotics trafficking activities for the time being.   VEGA also asked FLORES-SANTOS for FIGUEROA's BBM PIN and indicated that FIGUEROA's wife, Individual H, had FIGUEROA's BBM PIN.

**S.     Between July 3, 2014 and July 4, 2014, VEGA Instructed Individual H to Move Narcotics Proceeds Out of VEGA's House.**

249.     On July 3, 2014, at approximately 11:21 p.m. (Session #4541026), VEGA, using Target Device 4, had a BBM conversation with Individual H, who was using Target Device 7.[70]   In that conversation, VEGA stated, "Look, go to the house [VEGA's residence at 1744 Shari Lane, Aurora, Illinois] but park far away.  Take a safe to the tea [Salude Bienstar] and the white truck to Yeni.  They can put it away there."  Individual H asked, "Should we do it now or in the morning?"  VEGA replied, "Today, check 1 [one safe] to the tea [the Business]."  Individual H stated,

---

[70] See footnote 69 above.

"But, won't they [law enforcement] be there?" VEGA stated, "And, the truck, even if it's empty, to Yeni so it won't be over there [Vega's residence at 1744 Shari Lane]."

250. Continuing on July 3, 2014, at approximately 11:25 p.m. (Session #4541080), VEGA, using Target Device 4, had a BBM conversation with Individual H, who was using Target Device 7. Individual H asked, "Will they [law enforcement] be checking out the tea [Salude Bienstar]?" VEGA replied, "They [law enforcement] are not there. I don't think so. It's a business. Check it out. Go talk to Individual I [VEGA's wife][71] and give her the lawyer's number just in case." Individual H responded, "Yeah, but Brenda says a detective has been parked there outside the tea [Salude Bienstar] for 2 days." Individual H later asked, "Well, what did they [law enforcement] say to you? Hey well, it's scary to go over there now." VEGA replied, "Nothing, just in case. Do it carefully? Where?" Individual H stated, "So then are they [law enforcement] following us or does the car have something [narcotics or narcotics proceeds]? Well, over there at [Individual I]'s house [1744 Shari Lane, Aurora, Illinois]."[72] VEGA replied, "Park it far away." Individual H asked, "Would they [law enforcement] come over here to the house [641 Grand Avenue, Aurora, Illinois]?" VEGA stated, "Do it in case they go. They took the money we had [$21,000 seized by Webb County LEOs on July 3, 2014]. In case they [law enforcement] go, tell them I do live there but we're legalizing some cars. Have the lawyer's number just in case." Individual H later stated, "Oh, okay.

[71] On November 16, 2010, LEOs interviewed Individual I in an unrelated investigation and Individual I identified herself as VEGA's wife.

[72] According to utility records, cable service for 1744 Shari Lane is in Individual I's name.

104

Then, I'll go to [Individual I] right now and see if they [law enforcement] don't follow me." VEGA stated, "Don't take the 2 of them [two safes] out together. 1 by 1 [remove the safes one at a time]." Individual H replied, "Oh, okay. But, I am going to bring it [the safe] with me walking. And, is there a camera at the house? I think they [law enforcement] already put on there as well. Don't you think?" VEGA asked, "There is a camera at which house?" Individual H replied, "At the house [1744 Shari Lane, Aurora, Illinois] with [Individual I]." VEGA stated, "No, not at mine." VEGA further stated, "There are none. Check before you do it." Individual H asked, "Are you sure, because yesterday I saw a ball on the street light? Or, is that the way it was?" VEGA replied, "Take the white truck." Individual H stated, "Okay. I am going now. We'll see if I'm not followed and send me the lawyer's number." Later in the conversation, VEGA stated, "Alright, the one [the safe] on the basement first but bring someone to help you."

251. Continuing on July 4, 2014, at approximately 12:09 a.m. (Session #4541228), VEGA, using Target Device 4, had a BBM conversation with Individual H, who was using Target Device 7. Individual H stated, "I am here [VEGA's residence at 1744 Shari Lane] now." VEGA stated, "Take a look around. Would you be able to take 1 [one safe] out through the garage." Individual H replied, "Okay." VEGA further stated, "Take a good look, if not don't. But don't go alone." Individual H replied, "[Individual I] says tomorrow, that right now we'll put it [the safe] in the new car and she say early in the morning we'll take it [the safe] to Jenny. That way they [law enforcement] won't see that we moved anything."

Individual H later stated, "And, [Individual I] says 1 [one safe] is going to be taken by [Individual I's] father [Individual J]." Individual H further confirmed, "Yes, 1 [one safe] with Jeny and the other [other safe] with [Individual J] she [Individual I] says." Individual H later asked, "Hey, did they give you guys [VEGA and FIGUEROA] a court date?" VEGA replied, "No, they are just going to send the paper for us to see if we can say where the money came from. That's all." VEGA further stated, "But, they [law enforcement] are going to think there is more at the house. Don't you think?" Individual H replied, "That's true, but there isn't." VEGA responded, "That's why I want to move them [the safes]." Individual H stated, "There is nothing at the house [FIGUEROA's residence at 641 Grand Avenue, Aurora, Illinois]."

252. Continuing on July 4, 2014, at approximately 12:21 a.m. (Session #4541264), VEGA, using Target Device 4, had another BBM conversation with Individual H, who was using Target Device 7. VEGA stated, "Alright. Do that [move the safes] and early in the morning have the safe moved in the car. Give her [Individual I] the lawyer's number." Individual H responded, "[Individual J] is going to take the truck to his house." VEGA asked, "But is he [Individual J] going to stay there today?" Individual H later replied, "Yes, [Individual J] is going to stay there." VEGA stated, "That's fine."

253. Based on the above-described intercepted BBM communications, I believe that after VEGA and FIGUEROA were stopped by Webb County LEOs on July 3, 2014, VEGA contacted his sister and FIGUEROA's wife, Individual H, and

106

instructed her to go to VEGA's residence and remove two safes containing narcotics proceeds so LEOs would not find them. Individual H informed VEGA that one safe would be taken to an individual named "Jeny" and the other safe to VEGA's father-in-law, Individual J.

**T.** **On June 6, 2014, VEGA Instructed FIGUEROA and FLORES-SANTOS to Move Narcotics Proceeds to Individual J's Residence to Conceal VEGA's Narcotics Trafficking Activities.**

254. On June 6, 2014, at approximately 12:13 p.m. (Session #4455730), VEGA, using Target Device 4, had a BBM conversation with FIGUEROA, who was using Target Device 7. VEGA stated, "Alex [FIGUEROA], come to warehouse 1 and take everything out in the Acura." FIGUEROA asked, "Take what out? What happened?" VEGA replied, "Nothing. The city to going to go check. Take the tickets [narcotics proceeds] out and work material [narcotics]." FIGUEROA replied, "Okay. The material [narcotics] is outside in the white car. Only the tickets [narcotics proceeds]?" VEGA responded, "Yes. That thing with the heater is fine in case they check so they can't see what it does." VEGA further stated, "I'll see you at [Individual J's]. We'll store them [narcotics proceeds] there." FIGUEROA replied, "Okay." VEGA stated, "Alright then. Just the money with [Individual J] okay. Hide the material [narcotics]. FIGUEROA replied, "Okay, okay."

255. Continuing on June 6, 2014, at approximately 12:15 p.m. (Session #4455731), VEGA, using Target Device 4, had a BBM conversation with FLORES-SANTOS, who was using BBM PIN 334DF84F. FLORES-SANTOS asked, "Hey, what's happening at the 1 [Warehouse 1]? They are working there, washing the bus because Alex [FIGUEROA] says he is going to stop by over there to take everything

[narcotics proceeds] out." VEGA replied, "Nothing, the ones from the Siry [City of Aurora] are going over. He [FIGUEROA] should take out the cash, the machine, and the material [narcotics]. Make sure nothing can be seen. The gifts [narcotics] are fine in the car." FLORES-SANTOS replied, "Ok, so he [FIGUEROA] should put everything in a box?" VEGA stated, "Yes, that's fine. Just make sure that they are not in sight, and he [FIGUEROA] should take the cash over with [Individual J]."

256. Continuing on June 6, 2014, at 12:47 p.m. (Session #4455853), FIGUEROA, using Target Device 7, had a BBM conversation with VEGA, who was using Target Device 4. FIGUEROA asked, "Are you guys coming to the city? Wait here and I'll go by [Individual J's] house."

257. Continuing on June 6, 2014, at approximately 1:04 p.m. (Session #4455918), FIGUEROA, using Target Device 7, had another BBM conversation with VEGA, who was using Target Device 4. VEGA stated, "Yes." FIGUEROA replied, "They'll be here [Individual J's residence] in 10 minutes." VEGA responded, "Okay. Put everything [narcotics proceeds] in the trunk of the car. [Individual J] is there. I came by to drop off the batteries."[73] FIGERUOA replied, "Okay."

258. Based on location information for Target Device 4, used by VEGA, and the above-described intercepted BBM communications, I believe that VEGA instructed FIGUEROA and FLORES-SANTOS to remove narcotics and narcotics proceeds from Warehouse 1 while city officials inspect Warehouse 1. FIGUEROA

---

[73] Location information for Target Device 4 showed that at approximately 1:32 p.m., the device was in the vicinity of Individual J's residence at 1210 Superior Street, Aurora, Illinois.

informed VEGA that the narcotics are already outside of Warehouse 1 in a white vehicle. VEGA then instructed FIGUEROA and FLORES-SANTOS to take the narcotics proceeds to Individual J's residence for storage and safe-keeping during the city's inspection of Warehouse 1. Location information for Target Device 7, used by FIGUEROA, showed that on June 6, 2014, at approximately 1:37 p.m., Target Device 7 was in the vicinity of Individual J's residence at 1210 Superior Street, Aurora, Illinois.

   U.   **On October 29, 2014, VEGA Resumed His Narcotics Trafficking Activities and Arranged, with MARTINEZ, for the Delivery of Heroin to SANCHEZ.**

   259.   On October 29, 2014, at approximately 4:13 p.m. (Session #4787726), VEGA, using Target Device 9, had a conversation with MARTINEZ, who was using Target Device 1.[74] During that conversation, MARTINEZ asked, "What's up, Cousin? How is everything going over there [Chicago, Illinois]?" VEGA responded, "Fine, let me see if they're [VEGA's narcotics couriers] going to unload them [heroin] already." MARTINEZ responded, "Okay." VEGA responded, "Look, get a hold of a number [telephone number] for *Paisa* [SANCHEZ] for me so the guy [VEGA's narcotics courier] can give it [heroin] to him [SANCHEZ]."

---

[74] The identification of VEGA as the user of Target Device 9 is based on the following: (a) VEGA's use of the name "Paisa" in Session #4787726, which VEGA previously used on numerous occasions to refer to SANCHEZ, a wholesale narcotics customer of the VEGA DTO; and (b) location information for Target Device 9 showed that on October 27, 2014, at approximately 5:10 p.m., Target Device 9 was in the vicinity of W. North and N. Kedzie Avenues in Chicago, Illinois. LEOs subsequently observed a white Dodge truck in that area. At approximately 5:27 p.m. LEOs observed VEGA driving the white Dodge truck and VEGA was the sole occupant in the vehicle.

260.   Continuing on October 29, 2014, at approximately 4:39 p.m. (Session #4787727), VEGA, using Target Device 9, had a conversation with MARTINEZ, who was using Target Device 1.  During that conversation, MARTINEZ asked, "Cousin, or could the guy [VEGA's narcotics courier] not send them [heroin] to my buddy; the Mechanic [Individual A]?  And my buddy [Individual A] would receive them [heroin] over there. It would be useful for them [VEGA's narcotics courier] to give him an oil change or something like check out the truck for him.  What do you think about that and then that's that?  I will give my buddy [Individual A] a little something [money] for expenses."  VEGA responded, "No, I have the mechanic.  Just have *Paisa* [SANCHEZ] pick them [heroin] up."  MARTINEZ responded, "Yeah, I know, Cousin. What I'm asking is if he [VEGA's narcotics courier] could bring them [heroin] to the mechanic [Individual A], mine [the heroin due to MARTINEZ], and *Paisa* [SANCHEZ] could pick them [heroin] up there."  VEGA replied, "No, have him [SANCHEZ] pick them [heroin] up directly. It's a new guy [VEGA's new narcotics courier]."  MARTINEZ responded, "Okay."  VEGA stated, "Have him [SANCHEZ] go all the way to his [VEGA's narcotics courier's] house. He's [VEGA's narcotics courier] trustworthy."  MARTINEZ responded, "Okay."  VEGA stated, "The thing is I'm not going to go right there. The guy is going to do everything."  MARTINEZ responded, "Yeah, that's fine."  VEGA stated, "Have a number [SANCHEZ's telephone number] ready so I can give it to my cousin [VEGA's narcotics courier]."

261.    In the same BBM conversation, MARTINEZ later asked, "Cousin, how much are you going to leave [sell] them [heroin] at for me? At 44 [$44,000 per kilogram of heroin] as we had agreed?"  VEGA responded, "At 45 [$45,000 per kilogram of heroin].    Dude, it comes out to be more expensive bringing them [smuggling the heroin to the Chicago area] this way."  MARTINEZ responded, "Get the fuck out of here. Nothing will come out of it [profit from the sale of heroin] for you then."  VEGA stated, "At 45 [$45,000 per kilogram of heroin], like always." MARTINEZ responded, "Alright."

262.    Based on the above-described intercepted BBM communications, I believe that VEGA, along with MARTINEZ, agreed to distribute additional amounts of heroin in the Chicago area to SANCHEZ.    VEGA requested SANCHEZ's telephone number from MARTINEZ in order to coordinate the delivery of the heroin from VEGA's narcotics courier to SANCHEZ.    MARTINEZ requested that VEGA deliver the heroin to Individual A's garage, but VEGA disagreed and insisted that SANCHEZ pick up the heroin directly from his new narcotics courier.

## IV.    PROBABLE CAUSE FOR THE REQUESTED SEARCH WARRANTS

263.    The facts in this Affidavit also establish probable cause in support of a warrant to search the Subject Premises identified below (as further described below and in Attachments A-1 through A-4 corresponding to the premises, which also contain pictures of the premises), and to seize the records, documents, and other items in the Attachment B corresponding to the Subject Premises.    For each computer that the government searches, the government will follow the Computer Search Protocol outlined in the Addendum to the corresponding Attachment B.

a. 1691 Town Center, #105, Aurora, Illinois (the business Salude Bienstar).

b. 1201 Superior Street, Aurora, Illinois (Individual J's residence).

c. 2241 N. Monitor Avenue, Chicago, Illinois (ROBERTO SANCHEZ's residence).

d. 2404-2406 New Haven Court, Rockford, Illinois (ISAIAS MANDUJANO's residence).

264. The facts set forth in this Affidavit establish probable cause to believe that records, documents, and items (as further described in the Attachment B corresponding to each of the premises) constitute fruits, instrumentalities and/or evidence of a conspiracy to distribute and possess with intent to distribute narcotics, and the distribution of and possession of with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841 and 846, and further that a search of the premises will result in the discovery of such records, documents, and items.

265. As a result of my law enforcement experience and this investigation, I am familiar with the ways in which the members of the narcotics organization conduct their business, including, but not limited to, their methods of importing and distributing narcotics, their use of numerical codes and code words to conduct their transactions in secret, and their methods of laundering the proceeds of their narcotics trafficking. Through my experience and my discussions with other experienced LEOs, I am familiar with the methods, schemes, and operations used by major narcotics traffickers and know:

a.     Narcotics traffickers commonly place assets in names other than their own to avoid detection of these assets by law enforcement;

b.     Even though assets may be in other persons' names, narcotics traffickers continue to use those assets and exercise dominion and control over the assets;

c.     Narcotics traffickers keep books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of illegal drugs, and these documents may be in code. Because narcotics traffickers commonly "front" drugs (meaning they will provide illegal drugs to their customers on consignment and the customers will pay for it at a later date), narcotics traffickers' books, records, receipts, notes, ledgers, etc., are commonly maintained where the illegal drug traffickers have ready access to them, *i.e.*, homes, offices, and automobiles;

d.     Narcotics traffickers do not frequently and/or routinely dispose of or discard their ledgers, documents, and records related to the distribution of narcotics for the following reasons: (i) such records could be obtained by LEOs during a search of a trafficker's trash (a practice known as a "trash pull"), which narcotics traffickers are often aware of; (ii) such records contain information about narcotics transactions and arrangements for credit transactions (known as "fronting"), and transactions on consignments, all of which require future payment by customers for narcotics obtained from the narcotics trafficker, and for which the narcotics trafficker will need to keep ongoing records of payment activity, much the

113

same way a normal business operator will keep track of credit transactions; and (iii) narcotics traffickers will frequently keep names and contact information for their associates, suppliers, and customers written down for at least as long the narcotics trafficking relationship exists and possibly into the future, in the event that the narcotics trafficker has reason to obtain narcotics from the supplier in the future or has reason to contact the customer in the future should additional narcotics become available;

e. Narcotics traffickers commonly maintain records of illegal drug transactions, sources, and customers, in secure locations within their residences, offices, vehicles, garages, storage buildings, safety deposit boxes, and other locations, including stash houses, for ready access, and also to conceal such items from law enforcement;

f. Narcotics traffickers commonly conceal large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal drug trafficking activities, in their residences, offices, vehicles, garages, storage buildings, automobiles, and safety deposit boxes;

g. Narcotics traffickers commonly keep addresses or telephone numbers in books, papers, pagers, computers, tablets or cellular phones (and often have multiple cellular phones and pagers) corresponding to names, addresses,

and/or telephone numbers for their associates in the trafficking organization, even if stated items may be in code;

h. Narcotics traffickers frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that these traffickers usually maintain these photographs in their residences, computers, tablets, and cellular phones;

i. Narcotics traffickers commonly amass large monetary proceeds from the sale of illegal drugs and they attempt to legitimize these profits by utilizing foreign and domestic banks and their attendant services, including securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts and other methods. Narcotics traffickers commonly maintain proceeds of narcotics trafficking activity and evidence of financial transactions used to legitimize these profits in their residences, vehicles, offices, garages, storage buildings, automobiles, and safety deposit boxes;

j. Narcotics traffickers sometimes store documents and records relating to their drug supplies, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of drug trafficking;

k. Courts have found that unexplained wealth is probative evidence of criminal activity in which transactions involving large amounts of cash and high profit margins are common, including trafficking in controlled substances;

l. Narcotics traffickers frequently conceal and store items related to their narcotics trafficking and money laundering within safes, footlockers, boxes,

containers and other hidden compartments, including hidden compartments within vehicles, and within places that they own or over which they exercise control; and

m.     During the course of residential searches, I and LEOs have also found items of personal property that tend to identify the person or persons in residence, occupancy, control, or ownership of the premises, including such items as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility, telephone, and internet bills, or other mail, statements, identification documents, and keys.

### A.     The Business Salude Bienstar Located at 1691 Town Center, #105, Aurora, Illinois

266.    1691 Town Center, #105, Aurora, Illinois, is the lower-level unit on the northeast corner of a commercial, two-story structure with multi-colored siding and white trim.  This commercial structure, which is located on the south side of Town Center Street, in Aurora, Illinois, contains business and retail spaces on the lower level and condominium units on the second floor.  The numbers "1691" are black in color and affixed on the third deck post from the east corner of the commercial structure.  Suite 105 of the commercial structure has the name "Salude Bienstar," and has blue siding with white trim.  There is a white door with a glass window at the northeast corner of the suite.  This door is the principle entrance to Salude Bienstar.  The numbers "105" are white in color and are affixed on the glass above the door.

267.    According to the lease agreement for Salude Bienstar, VEGA's wife, Individual J, is one of the tenants of the business, which is described in the lease

agreement as an "Herbal Life Office." As set forth previously in this Affidavit, on July 4, 2014, a day after Webb County LEOs seized approximately $21,000 from VEGA and FIGUEROA in Texas, VEGA instructed Individual H, VEGA's sister and FIGUEROA's wife, to move narcotics proceeds out of VEGA's residence at 1744 Shari Lane, Aurora, Illinois to Salude Bienstar for safe-keeping. In addition, throughout the investigation, LEOs have observed VEGA and FIGUEROA at Salude Bienstar. For example, on June 3, 2014, approximately seven minutes after VEGA provided FIGUEROA the telephone number of the individual who was to deliver $600,000 in narcotics proceeds to FIGUEROA (see paragraph 163 above), LEOs observed VEGA, FIGUEROA, and FLORES-SANTOS meet in front of Salude Bienstar. The next day, FIGUEROA and BETANCOURT picked up $600,000 of narcotics proceeds from RODRIGUEZ.

### B. Individual J's Residence Located at 1210 Superior Street, Aurora, Illinois

268. 1210 Superior Street, Aurora, Illinois, is a one-story, single family residence located on the north side of Superior Street and is the fourth structure east of Loucks Street in Aurora, Illinois. The residence at blue siding, white trim, a grey-shingled roof and black bars over the front windows. On the south side of the structure, there are steps which lead to an open porch on the first floor of the residence. The numbers "1210" are black in color and are affixed on the white trim above the porch. On the west side of the residence, there is a concrete driveway, which leads to a wooden fence. Behind the wooden fence at the rear of the lot is a two-car garage with white siding, dark trim, and a south-facing white garage door.

269. According to law enforcement and public records, Individual J is the registered owner of 1210 Superior Street, Aurora, Illinois. In addition, information obtained from law enforcement databases show that Individual J is a relative of Individual I, VEGA's wife. On September 20, 2013, LEOs conducted a trash pull at the residence and found various documents and two pill bottles addressed to Individual J at 1210 Superior Street, Aurora, Illinois. As set forth above, on June 6, 2014, VEGA instructed FIGUEROA to move narcotics proceeds from Warehouse 1 and take them to Individual J's residence. In addition, on July 4, 2014, Individual H informed VEGA that one safe containing narcotics proceeds would be moved to Individual J's residence. Based on my training, experience, and participation in this investigation, I believe that the VEGA DTO uses 1210 Superior Street, Aurora, Illinois, to store proceeds of drug transactions and other evidence regarding the DTO's narcotics trafficking activities. As such, there is probable cause to believe that safes or other containers containing narcotics proceeds and that records relating to the VEGA DTO's narcotics trafficking activities are maintained at this location.

C.  **ROBERTO SANCHEZ's Residence Located at 2241 N. Monitor Avenue, Chicago, Illinois**

270. 2241 N. Monitor Avenue, Chicago, Illinois, is a one-story, single family residence with white siding over tan brick, white trim, and a black shingled roof. The residence is located on the east side on Monitor Ave. between W. Belden Ave. and W. Grand Ave. in Chicago, Illinois. On the west side of the residence there are concrete stairs which lead to a storm door with dark bars and small windows. The

storm door leads to a white door with small window, which is the principle entrance to the residence. The numbers "2241" are black in color and are affixed on white trim above the door to the residence. At the rear of the lot there is a detached, two-car garage with tan siding, white trim and an east-facing, white garage door.

271. According to public records, SANCHEZ is one of the registered owners of 2241 N. Monitor Avenue, Chicago, Illinois. The investigation has shown that SANCHEZ purchase from the VEGA DTO multi-kilogram quantities of heroin, which he then distributes to his own narcotics customers. In addition, on March 27, 2014, LEOs observed a Jeep parked in front of 2241 N. Monitor Avenue. As discussed above, on March 28, 2014, SANCHEZ, driving this same Jeep, delivered narcotics proceeds to Individual A on MARTINEZ's behalf. In addition, according to Illinois Secretary of State records, SANCHEZ is the president and registered agent for R. Sanchez Landscaping, Inc., which has a registered address of 2241 N. Monitor Avenue, Chicago, Illinois. Based on my training and experience, given that SANCHEZ is a wholesale narcotics customer of the VEGA DTO and operates a business, there is probable cause to believe that at SANCHEZ's main residence, he may keep records relating to his narcotics trafficking and money laundering activities, either on a computer or in other form.

**D.      ISAIAS MANDUJANO's Residence Located at 2404-2406 New Haven Court, Rockford, Illinois**

272. 2404-2406 New Haven Court, Rockford, Illinois, is a one-story, two-family residence with light-colored brick, vinyl siding, and a tan-colored roof. The residence is located on the northwest section of New Haven Court, in the cul-de-sac

portion of the street. The structure has two white, south-facing garage doors. The numbers "2406" are black in color and affixed on the white trim above the garage door, which is on the southeast side of the structure. Next to the garage door marked "2406," there are three concrete steps leading to a white door, which is the main entrance for the "2406" side of the structure. The numbers "2404" are black in color and affixed on the white trim above the garage door, which is on the southwest side of the structure. Next to the garage door marked "2404," there are three concrete steps leading to a white door, which is the main entrance for the "2404" side of the structure.

273. According to information obtained from law enforcement databases and tax records from the Treasurer's Office of Winnebago County, Illinois,[75] 2404-2406 New Haven Court is a two-family residence on one parcel of land. The owner of that entire parcel is ISAIAS MANDUJANO with an address of 2404 New Haven Court, Rockford, Illinois. According to law enforcement databases, the utilities for 2404-2406 New Haven Court are registered in MANDUJANO's name. MANDUJANO's address on his Illinois driver's license is listed as 2404 New Haven Court, Rockford, Illinois. The Lexus, which MANDUJANO drove during the April 29, 2014, heroin transaction with SANCHEZ, is registered to MANDUJANO at 2406 New Haven Court, Rockford, Illinois. On December 2, 2014, LEOs observed MANDUJANO enter 2406 New Haven Court. Based on my training and experience, given that MANDUJANO is a wholesale narcotics customer of

---

[75] Rockford is in Winnebago County, Illinois.

SANCHEZ and has his own set of customers to whom he re-distributes the heroin, there is probable cause to believe that at MANDUJANO's main residence, he may keep records relating to his narcotics trafficking activities and money laundering activities, either on a computer or in other form.

## SPECIFICS REGARDING SEARCHES OF COMPUTER SYSTEMS

280. Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The

vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

281. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

282. In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crimes, and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

### PROCEDURES TO BE FOLLOWED IN SEARCHING COMPUTERS

283. The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application

authorizes the removal of computers and related media so that they may be searched in a secure environment.

284. With respect to the search of any computers or electronic storage devices seized from the locations identified in Attachments A-1 through A-4 hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

  a. examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

  b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

  c. surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

d.    opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

e.    scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

f.    performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in the Attachment B corresponding to the Subject Premises.

285.   Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## V.   PROBABLE CAUSE FOR THE REQUESTED VEHICLE SEIZURE WARRANTS

286.   *Vehicles used by SANCHEZ to facilitate drug transactions*:  As discussed above, SANCHEZ used: (i) a Jeep Wrangler bearing Illinois license 80028FF to deliver narcotics proceeds to Individual A on March 28, 2014 and April 7, 2014 (see paragraphs 53 and 62); and (ii) a Nissan sedan bearing Illinois license 78389FF to deliver one kilogram of heroin to MANDUJANO on April 29, 2014 (see paragraphs 124-126).  As such, there is probable cause to believe that upon conviction of SANCHEZ, the 2008 silver Jeep Wrangler bearing Illinois license 80028FF, with a VIN of 1J8GA69108L586356, and the grey Nissan bearing Illinois license 78389FF, with a VIN of 1N4AA51E19C803619, both of which are registered

to ROBERTO SANCHEZ, 1301 Auburn Court, Rockford, Illinois, will be subject to forfeiture, pursuant to Title 21, United States Code, Sections 853(a)(2) and (f).

287. ***Vehicles used by FIGUEROA to facilitate drug transactions***: As discussed above, FIGUEROA used: (i) an Acura bearing Illinois license N773755 to deliver $263,000 in narcotics proceeds to CS-1 on September 5, 2013 (see paragraphs 33-34); (ii) an Acura SUV bearing Illinois license E246944[76] to pick up $47,700 in narcotics proceeds from SANCHEZ on April 27, 2014 (see paragraphs 82-86), and to pick up from Individual A on April 16, 2014 the Chrysler Pacifica, which was used to transport approximately 31 kilograms of heroin on June 10, 2014 (see paragraph 74); (iii) a Ford Edge bearing Illinois license V333147 prior to picking up the Chrysler Pacifica with BETANCOURT on June 4, 2014 to pick up narcotics proceeds from RODRIGUEZ (see paragraph 164), and prior to delivering approximately 25 kilograms of heroin to RODRIGUEZ on June 7, 2014 (see paragraph 201); and (iv) a white Acura bearing Illinois license V464033 prior to delivering approximately 31 kilograms of heroin to Individual C on June 10, 2014 (see paragraph 225). As such, there is probable cause to believe that upon conviction of FIGUEROA, (i) the Acura bearing Illinois license N773755, with a Vehicle Identification Number of 19UYA42621A027383, and (ii) the Ford Edge bearing Illinois license V333147, with a Vehicle Identification Number of 2FMDK36C17BB29755, both of which are registered to Individual H, 641 Grand Avenue, Aurora, Illinois, as well as (iii) the Acura SUV bearing Illinois license

---

[76] On April 27, 2014, the Acura SUV had Illinois license V331444.

E246944, with a Vehicle Identification Number of 2HNYD18681H525448, registered to Individual K, 803 Magnolia Drive, North Aurora, Illinois, and (iv) the white Acura bearing Illinois license V464033, with a Vehicle Identification Number of 2HNYD18926H536138, registered to ALEXANDER FIGUEROA, 641 Grand Avenue, Aurora, Illinois, will be subject to forfeiture, pursuant to Title 21, United States Code, Sections 853(a)(2) and (f).

288. *Vehicle used by VEGA to facilitate a drug transaction*:  As discussed above, VEGA used a white Dodge truck bearing Illinois license 78205X to conduct counter surveillance at Warehouse 2 on June 1, 2014 while FLORES-SANTOS unloaded heroin from a passenger bus at the warehouse (see paragraphs 155-159).  As such, there is probable cause to believe that upon conviction of VEGA, the 2007 white Dodge truck bearing Illinois license 78205X, with a Vehicle Identification Number of 1D7HU16P07J574755, registered to Individual J, 1210 Superior Street, Aurora, Illinois, will be subject to forfeiture, pursuant to Title 21, United States Code, Sections 853(a)(2) and (f).

289. *Vehicle used by MANDUJANO to facilitate a drug transaction*: As discussed above, on April 29, 2014, MANDUJANO used a silver Lexus bearing Illinois license R663521 to meet SANCHEZ, who provided MANDUJANO with one kilogram of heroin (see paragraphs 124-126).  As such, there is probable cause to believe that upon conviction of MANDUJANO, the silver 2007 Lexus bearing Illinois license R663521, with a Vehicle Identification Number of JTHBJ46G472118969, registered to ISAIAS MANDUJANO, 2406 New Haven

Court, Rockford, Illinois, will be subject to forfeiture, pursuant to Title 21, United States Code, Sections 853(a)(2) and (f).

290. Based on the foregoing, there is probable cause to believe that the above-described vehicles will be subject to forfeiture upon conviction of SANCHEZ, FIGUEROA, and VEGA for violations of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute and to distribute heroin) and of MANDUJANO for a violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute heroin). In order to ensure the availability of the vehicles for forfeiture, Title 21, United States Code, Section 853(e) authorizes the entry of a restraining order or any other action necessary to preserve the property. Title 21, United States Code, Section 853(e) states, in the same manner as provided for a search warrant, a seizure warrant may issue when the property would, in the event of conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture. The government seeks a seizure warrant under Section 853(f) because a restraining order or any other action is not sufficient to assure the availability of the above-described vehicles for forfeiture. Courts have long recognized the unique circumstances involved in seizing vehicles due to their inherent mobility. In *Florida v. White*, 526 U.S. 559 (1999), the Supreme Court found that a warrantless seizure did not violate the Fourth Amendment where there was probable cause to believe that the automobile was subject to forfeiture because movable contraband may be "spirited away." In addition, in the instant matter, any restraining order

127

would not be issued to an independent third party, such as a bank or other lienholder, but to the registered owners of the Subject Vehicles, who are either the defendants or individuals related to the defendants.

291.    Furthermore, in my experience, I know that motor vehicles are easily transferred or hidden thereby making them difficult to locate.  Moreover, I am aware that the appearance of a motor vehicle can be altered or it can be concealed in a garage or storage area making it difficult, if not impossible, to find for the purpose of forfeiture proceedings.  In addition, motor vehicles can be transported outside the district further increasing the potential unavailability of these motor vehicles for forfeiture in the event of conviction.  Furthermore, I know that unless a motor vehicle is seized, it can be difficult to preserve the value of the motor vehicle for forfeiture purposes because financial obligations relating to the vehicle, including insurance payments and loan obligations are not satisfied, when an owner is notified that it is likely that his property will be subject to forfeiture.

## VI.    CONCLUSION

292.    Based on the foregoing, it is Your Affiant's belief that there is probable cause to believe as follows:

a.    Beginning no later than August 2013 and continuing to in or about November 2014, in the Northern District of Illinois and elsewhere, defendants PABLO VEGA CUEVAS, ARTURO MARTINEZ, ALEXANDER FIGUEROA, ELISEO BETANCOURT-PEREIRA, WILFREDO FLORES-SANTOS, ROBERTO SANCHEZ, and JOSE RODRIGUEZ did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent

to distribute and distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846.

b.     On or about April 29, 2014, in the Northern District of Illinois, ISAIAS MANDUJANO, did knowingly and intentionally possess with intent to distribute a controlled substance, namely, 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

293.    Based on the foregoing, I believe that there is probable cause in support of a search warrant for the Subject Premises identified below for evidence of the commission of conspiracy to possess with intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846, and possession with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1):

a.     1691 Town Center, #105, Aurora, Illinois (the business Salude Bienstar).

b.     1201 Superior Street, Aurora, Illinois (Individual J's residence).

c.     2241 N. Monitor Avenue, Chicago, Illinois (ROBERTO SANCHEZ's residence).

d.     2404-2406 New Haven Court, Rockford, Illinois (ISAIAS MANDUJANO's residence).

129

294. Based on the foregoing, I believe that there is probable cause in support of the seizure of the Subject Vehicles listed below because the Subject Vehicles represent property used and intended to be used, in any manner or part, to commit and to facilitate the commission of conspiracy to possess with intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846, and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1):

a.      A 2008 silver Jeep Wrangler bearing Illinois license 80028FF, with a Vehicle Identification Number of 1J8GA69108L586356, registered to ROBERTO SANCHEZ, 1301 Auburn Court, Rockford, Illinois.

b.      A 2009 grey Nissan bearing Illinois license 78389FF, with a Vehicle Identification Number of 1N4AA51E19C803619, registered to ROBERTO SANCHEZ, 1301 Auburn Court, Rockford, Illinois.

c.      A 2001 maroon Acura bearing Illinois license N773755, with a Vehicle Identification Number of 19UYA42621A027383, registered to Individual H, 641 Grand Avenue, Aurora, Illinois.

d.      A 2007 black Ford Edge bearing Illinois license V333147, with a Vehicle Identification Number of 2FMDK36C17BB29755, registered to Individual H, 641 Grand Avenue, Aurora, Illinois.

e.      A 2001 Acura bearing Illinois license E246944, with a Vehicle Identification Number of 2HNYD18681H525448, registered to Individual H, 641 Grand Avenue, Aurora, Illinois.

      f.      A 2006 white Acura bearing Illinois license V464033, with a Vehicle Identification Number of 2HNYD18926H536138, registered to ALEXANDER FIGUEROA, 641 Grand Avenue, Aurora, Illinois.

      g.      A 2007 white Dodge truck bearing Illinois license 78205X, with a Vehicle Identification Number of 1D7HU16P07J574755, registered to Individual J, 1210 Superior Street, Aurora, Illinois.

      h.      A 2007 silver Lexus bearing Illinois license R663521, with a Vehicle Identification Number of JTHBJ46G472118969, registered to ISAIAS MANDUJANO, 2406 New Haven Court, Rockford, Illinois.


FURTHER AFFIANT SAYETH NOT.

ADAM J. STACHECKI
Special Agent
Drug Enforcement Administration


Sworn and subscribed to before me on this
8th day of December, 2014

SIDNEY I. SCHENKIER
United States Magistrate Judge

131